<table>
<tr><td colspan="3" align="center">ESTADO LIBRE ASOCIADO DE PUERTO RICO<br>TRIBUNAL DE APELACIONES<br>PANEL ESPECIAL</td></tr>
<tr>
<td>ESTADO LIBRE ASOCIADO DE PUERTO RICO; DEPARTAMENTO DE RECURSOS NATURALES Y AMBIENTALES DEL GOBIERNO DE PUERTO RICO<br>**Demandantes - Apelados**<br><br>**v.**<br><br>JULIA SOLTERO RINALDI DE OPPENHEIMER t/c/c JULIE SOLTERO DE OPPENHEIMER, viuda de Jorge Oppenheimer Méndez; JULIA MILAGROS OPPENHEIMER SOLTERO; RAFAEL JULIÁN OPPENHEIMER SOLTERO; EDIZ MARÍA OPPENHEIMER SOLTERO; CONCEPCIÓN MARÍA OPPENHEIMER SOLTERO; MARÍA ELENA OPPENHEIMER SOLTERO t/c/c MARIELENA OPPENHEIMER SOLTERO y MARÍA JORGE OPPENHEIMER SOLTERO; GUILLERMO GODREAU VEGUILLA; JOSEFA VEGUILLA; VANESSA NIEVES SANTIAGO; MIGUEL A. FLORES TORRES; PABLO VERGARA RAMOS y su esposa JUDITH AGNES RIVERA DÍAZ t/c/c AGNES JUDITH RIVERA DÍAZ; EDGAR CRUZ FALCÓN y su esposa MILAGROS MARTÍNEZ REYES; ALBERTO E. PAGÁN RIVERA; ÁNGEL BENÍTEZ RODRÍGUEZ; AWILDO JIMÉNEZ MERCADO, ALNARDO VÁZQUEZ SANTIAGO; VÍCTOR FELICIANO BONILLA y su esposa Esperenceja Más Cual; RAMÓN LÓPEZ VÉLEZ y su esposa GRECY MARIE CORREA CARRASQUILLO; JENNIFER ALEMÁN, su esposo FÉLIX A. DÍAZ y la SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS; SUHAIL ALEMÁN, su esposo PABLO RODRÍGUEZ MÉNDEZ y la SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS; ALLAN JUHASZ y su esposa JUDIE LIEB y la SOCIEDAD LEGAL DE GANANCIALES POR AMBOS CONFORMADA; RAFAEL CARABALLO DÍAZ; CACIQUE BEACH RESORT, LLC; DEMANDADOS DE NOMBRES DESCONOCIDOS y DESCONOCIDOS A, B, C, D, E y F; ENTIDADES JURÍDICAS ABC, DEF y GHI; COMPAÑÍAS ASEGURADORAS X, Y y Z y OTROS<br>**Demandados – Apelantes**<br><br>**v.**<br><br>CARLOS RAMÓN VEGA SANTOS, su esposa Jane Doe y la SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS; MUNICIPIO AUTÓNOMO DE CAYEY, MUNICIPIO AUTÓNOMO DE COAMO; MUNICIPIO AUTÓNOMO DE VILLALBA, MUNICIPIO AUTÓNOMO DE SALINAS<br>**Terceros Demandados - Apelados**</td>
<td>TA2025AP00594<br><br>TA2025AP00595<br><br>TA2025AP00596<br><br>TA2025AP00597<br><br>TA2025AP00598<br><br>TA2025AP00605</td>
<td>*Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Guayama<br><br><br>Caso Núm.: GM2022CV00290<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Sobre: Sentencia declaratoria; Acción reivindicatoria; Desalojo</td>
</tr>
</table>

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Marrero Guerrero y el Juez Campos Pérez

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 6 de mayo de 2026.

**I.**

La causa presente se inició el 28 de abril de 2022, ocasión en que la parte demandante y apelada, Estado Libre Asociado de Puerto Rico (Estado), en representación del Departamento de Recursos Naturales y Ambientales (DRNA), presentó una demanda sobre sentencia declaratoria, acción reivindicatoria de **51,463.937 metros cuadrados** de la actual finca **14269** (resultado de la agrupación de las fincas **5791 o Lugo Viña** y **13320**) y el desalojo en contra de los demandados y apelantes del epígrafe, quienes son titulares de participaciones proindivisas de la finca **3752 o La Cuarta**.[1] La finca **14269** comprende la Reserva Nacional de Investigación Estuarina de Bahía de Jobos (Reserva), designada por el Gobierno federal como el undécimo lugar de interés del Sistema Nacional de Reservas de Investigación Estuarina.

En esencia, el DRNA alegó que los demandados ocupan ilegalmente propiedad pública. Es decir, que **los títulos propietarios de La Cuarta que ostentan no corresponden al lugar físico donde están ubicados**. Expuso que la Reserva es hogar de varias especies en peligro de extinción, y que sirve de protección a una variada flora y fauna. Añadió que dentro de la Reserva proliferan construcciones y obras ilegales, las cuales inciden sobre la protección del ambiente, agravando el fraccionamiento del manglar, lo que a su vez causa una reducción de la protección que éste ofrece como hábitat para especies de peces, aves y otros organismos. Sostuvo la creencia que los demandados aprovecharon momentos catastróficos, como el huracán María y la pandemia del COVID-19, para

---

[1] Entrada 1, así como las enmiendas a la reclamación en las entradas 45 (Anejo) y 380, *Tercera Demanda Enmendada,* del caso GM2022CV00290 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).

acelerar las construcciones indebidas en la zona. El DRNA dijo que ha identificado casas, casas móviles, lotes rellenados y gazebos para uso recreacional y vacacional.[2] A base de evidencia fotográfica del aérea, el demandante mostró el cambio drástico en la costa del Camino del Indio, donde ubica la Reserva, debido al incremento de dichas estructuras en la zona.[3]

Luego de describir el tracto registral que precedió a la finca **14269**, el DRNA solicitó una sentencia declaratoria para que el tribunal decretara que la finca **5791** pertenece exclusivamente al DRNA. Ejerció una acción reivindicatoria sobre los terrenos públicos ocupados. En específico, los que transcurren en la parte del sector del Camino del Indio, ubicado dentro de la Reserva, el cual inicia en las coordenadas **N: 17.9377655; W: 66.2587637** y se extiende hacia el Sur hasta incluir el predio ocupado por la familia Oppenheimer-Soltero.[4] Finalmente, peticionó la entrega expedita de la cosa y el desalojo inmediato de los demandados, así como la demolición de todas las estructuras y la restauración del área invadida a su estado original a costa de éstos.

En sus correspondientes alegaciones responsivas, en particular, a la *Tercera Demanda Enmendada*, en síntesis, los demandados adujeron lo opuesto, que **sus títulos de propiedad sobre las participaciones proindivisas de La Cuarta sí correspondían al lugar que poseen**. Los demandados instaron múltiples reconvenciones contra el Estado por daños pecuniarios; e incoaron demandas contra terceros: el Agrim. Carlos Ramón Vega Santos, contratado por el Estado, y el Consorcio CCVS, que comprende los Municipios de Cayey, Coamo, Villalba y Salinas, el cual aprobó el 17 de julio de 2017 la rectificación de cabida en el caso 2017-203193-ARC-001487.[5]

---

[2] Refiérase al anejo 66 (apéndice 21) entrada 891 SUMAC.

[3] Refiérase al anejo 66 (apéndice 31) entrada 891 SUMAC.

[4] Desde la coordenada X=218,494.3939; Y=211,567.4102 hasta la coordenada X=218,797.2581; Y=211,444.9205.

[5] Entradas 390-393, 396-398, 491, 509, 522, 458, 538, 560 SUMAC. A Judie Lied y a la Sociedad Legal de Gananciales compuesta por ésta y su esposo (el demandado y apelante

Reconvenidos y terceros demandados incoaron sus respectivas contestaciones.[6]

En atención a las cuestiones planteadas en los recursos apelativos, los demandados rechazaron las coordenadas alegadas por el Estado y defendieron sus títulos propietarios. Abogaron por la legalidad de la ubicación de los predios que poseen, por éstos estar fuera de la Reserva y no haber sido parte de la transacción en la adquisición de la finca **5791 o Lugo Viña**. La familia Oppenheimer-Soltero, por ejemplo, mostró una carta de la Autoridad de Acueductos y Alcantarillados fechada el 5 de abril de 2022 que ubica su estructura al lado del Santuario Jabanés [*sic*], en Salinas.[7] Con ello, afirmó que estaba fuera de la Reserva; <u>al Este de la carretera estatal PR-703, no al Oeste</u>; y que desde la corona española en el 1888 esos terrenos habían estado en manos privadas, no de dominio público, lo que fue ratificado por el Tratado de París de 1898. Igualmente, esta parte demandada defendió su titularidad sobre el islote sin nombre, denominado "Islote Julie y Jorge".

Además de la ubicación de los terrenos en controversia y alegaciones de incautación sin el debido proceso de ley, en general, los demandados coincidieron en la contención de la falta de partes indispensables, en referencia al resto de los condóminos de **La Cuarta**, entre otros; e incluso adujeron un procesamiento discriminatorio y selectivo. Se refirieron al procedimiento federal de quiebra de Guillermo González Hernández, B-29-

---

Allan Juhasz), se les anotó la rebeldía. Los demandados Josefa Veguilla y Guillermo Godreau Veguilla, hijo de Guillermo Godreau Marrero, instaron sus respectivas contestaciones, reconvenciones y demandas contra terceros, posteriormente desistieron de éstas. Por varios incumplimientos, el foro judicial los sancionó económicamente y eliminó las alegaciones de los rebeldes. A esos efectos, ordenó a la Secretaría a notificarlos directamente. Además, el tribunal primario desestimó la reconvención de Miguel Flores Torres de conformidad con la Regla 39.2 de Procedimiento Civil. Por su parte, el DRNA desistió de su reclamación en contra de Brendaliz Cotto León, Carmen Santiago Berrios, Myrna Mercado Collazo, su esposo, Awildo Jiménez Rodríguez y la Sociedad de Bienes Gananciales compuesta por ambos; así como de otros demandados de nombres desconocidos. A esos efectos, se dictaron las correspondientes *Sentencias Parciales*. Refiérase a las entradas 134-135, 459, 474, 557, 716, 731-732, 769 y 836 SUMAC.

[6] Entradas 564-568, 651, 658, 674-675, 677-678, 697-698, 708, 713 SUMAC. El agrimensor Vega Santos prevaleció en su solicitud de desestimación de la causa en su contra instada por Miguel A. Flores Torres, Alberto E. Pagán Rivera, Edgar Cruz Falcón, Milagros Martínez Reyes, Pablo Vergara Ramos y Judith Agnes Rivera Díaz. El tribunal *a quo* dictó la correspondiente *Sentencia Parcial.* Entrada 928 SUMAC.

[7] Anejo 1 entrada 391 SUMAC. La misiva añade que no constaba que la familia Oppenheimer-Soltero hubiera presentado un permiso de uso.

63, que dio paso a la compraventa de **La Cuarta** por parte de Guillermo Godreau Marrero, cuyas decisiones judiciales indicaron que eran cosa juzgada. Aludieron al litigio *United States of America v. Guillermo Godreau, et als.*, 77-173, y aseguraron que las autoridades federales reconocieron la corrección de su ubicación. Mencionaron también el pleito estatal sobre *injunction* GPE-1998-0037 entre los comuneros contra el DRNA. De igual modo, arguyeron que el Estado, por acciones y omisiones, legitimó la lotificación sin permisos de 44 solares realizada en **La Cuarta**.

De otro lado, los demandados imputaron la nulidad de la mensura y la rectificación de cabida aprobada por el Consorcio CVS, por presuntamente haberse realizado sin notificación a los colindantes del Camino del Indio; y señalaron la ausencia de amojonamiento e incongruencias en los lindes de las descripciones registrales provistas por el agrimensor Vega Santos, de quien dijeron que realizó un ejercicio de "sastrería geográfica". Aseguraron que la finca **5791 o Lugo Viña** no incluía sus terrenos, de conformidad con el *Plano de una finca situada en los barrios Rosada y Aguirre de Salinas P.R., Propiedad de la Sucn. de Eduardo Lugo Viña*, que se remonta a mayo de 1922 y fue realizado por el Ing. Ramón R. Roig.[8] En fin, avalaron la conclusión del Ing. Jorge Colón Jordán, quien en su informe pericial expresó que los demandados no eran invasores, sino colindantes.[9]

Algunos demandados invocaron la prescripción adquisitiva, junto a la posesión de sus antecesores, derechos adquiridos y la doctrina de actos propios, ante la desidia gubernamental que no hizo nada en décadas, a pesar de contar con las fotografías suministradas. Aseveraron que el DRNA confundía sus propios linderos, por no haber ejercido dominio de su finca durante décadas ni demarcado sus límites y haber ignorado la realidad registral y extrarregistral. Abogaron por la improcedencia de la acción reivindicatoria por tardía, aduciendo entrampamiento, mala fe e incuria.

---

[8] Véase, anejo 42 entrada 891 SUMAC o anejo 11 entrada 871 SUMAC.
[9] Anejo 1 entrada 318 SUMAC; además, entrada 61 SUMAC.

El *Informe preliminar de conferencia con antelación al juicio* se presentó el 10 de noviembre de 2023.[10] Las partes *propusieron* sobre trescientas estipulaciones fácticas, suprimiendo hechos controvertidos; y concurrieron en la anuencia de decenas de documentos.

Culminado el procedimiento de descubrimiento de prueba, las partes incoaron múltiples mociones dispositivas de naturaleza sumaria; así como las respectivas oposiciones y documentos de apoyo.[11] Entre éstos, constan planos físicos y digitalizados, certificaciones y folios registrales, escrituras públicas, fotografías terrenas y aéreas, deposiciones, documentos judiciales, públicos, privados e informes periciales.

El 6 de febrero de 2024, notificada por edicto el 26 de septiembre de 2025, el Tribunal de Primera Instancia, Sala Superior de Guayama (TPI), dictó sumariamente la *Sentencia* apelada.[12] En ésta, consignó 188 determinaciones de hechos, que citamos parcialmente:[13]

. . . . . . . .

2. La finca núm. 267, mejor conocida como Monte del Estado, nace por posesión del Estado desde la conquista de la isla de Puerto Rico por Juan Ponce de León.

3. La finca núm. 267 está sujeta a las servidumbres legales de anden y salvamento.

4. De la finca núm. 267 se segregó la finca núm. 383 que se halla registrada al folio 50 del tomo 8 de Salinas.

5. Posteriormente, de la finca núm. 267 se segregó una porción de 85.72 cuerdas vendida a Valentín Paoli Antomattey, finca núm. 828, inscrita al folio 88 del tomo 18 de Salinas.

6. Según la descripción de la finca núm. 828, expuesta su primera inscripción, efectuada en el 1920, al folio 88 del tomo 18vo de Salinas, la finca núm. 828 colindaba por el Norte con la Laguna Monserrate, por el Sur con el mar Caribe, por el Oeste con el mar Caribe y por el Este con la finca de Eduardo Lugo Viña.

7. La finca núm. 828 vendida a don Valentín Paoli Antomattey, se encuentra identificada por el nombre de Valentín Paoli, al Oeste de la hoy carretera PR-703, en el plano que lleva por título *Plano de una Finca situado en los barrios Rosado y Aguirre en Salinas P.R.,* firmado por el Ing. Ramón M. Roig, con fecha de mayo 1922.

---

[10] Entrada 997 SUMAC.

[11] Entradas 846, 848, 853, 855-858, 860-862, 864-866, 868-875, 891, 877-879, 892-894, 896-899, 902-907, 911, 913, 936-937, 940-956, 958-960, 962-964 SUMAC. Además, se incoaron varias mociones dispositivas de desestimación con sus respectivas oposiciones: entradas 847, 850, 937, 942, 965 SUMAC.

[12] Entradas 1015 SUMAC. Hubo un trámite apelativo previo ante este panel; refiérase a la entrada 1068 SUMAC.

[13] Énfasis en el original suprimido. Para la referencia de los documentos específicos que apoyan las aseveraciones, véase la *Sentencia* en la entrada 1015 SUMAC. Con posterioridad reproducimos otras aseveraciones fácticas conforme los temas discutidos.

. . . . . . . .

10. La descripción legal de la finca núm. 383, antes de que se segregara la porción que formó la finca núm. 5791, coincide con las colindancias plasmadas en el plano titulado: *Plano de una Finca situado en los barrios Rosado y Aguirre en Salinas P.R.*, firmado por el Ing. Ramón M. Roig, con fecha de mayo 1922.

. . . . . . .

13. En el plano que lleva por título *Plano de una Finca situado en los barrios Rosado y Aguirre en Salinas P.R.*, existen líneas entrecortadas y líneas continuas.

14. En la deposición realizada al agrimensor Vega Santos el 10 de abril de 2023, el agrimensor expuso que las líneas entrecortadas del *Plano de una Finca situado en los barrios Rosado y Aguirre en Salinas P.R.*, es un polígono de control, mientras que la línea sólida —no entrecortada—, es la línea de colindancia.

. . . . . . . .

18. El plano titulado *Plano de una Finca situado en los barrios Rosado y Aguirre en Salinas P.R.*, firmado por el Ing. Ramón M. Roig, con fecha de mayo 1922, ilustra en la parte Sur del mismo los puntos 38 al 47. Los mencionados puntos se encuentran conectados unos con otros por una línea entrecortada.

19. Los puntos 38 al 47 del *Plano* mencionado en el renglón anterior dejan fuera una porción de terreno en la dirección Oeste y Sur en referencia a la línea entrecortada que une a los puntos.[14]

. . . . . . . .

24. El 14 de julio de 1971, por medio de la Corte Federal de Distrito para Puerto Rico, dentro de un proceso de quiebra y sindicatura bajo el Caso Núm. B-29-63 llevado contra el Sr. Guillermo González Hernández, el Sr. Guillermo Godreau Marrero adquirió soltero una parcela de terreno en el área de Los Indios, barrio Las Mareas en Salinas.

25. El contrato de compraventa privado fue aprobado por la Corte de Quiebras de la Corte de los Estados Unidos para el Distrito de Puerto Rico el 30 de noviembre de 1971.

26. Las segregaciones realizadas para la compraventa privada de los terrenos bajo sindicatura del Sr. Guillermo González Hernández, fueron segregaciones incidentales. En otras palabras, las segregaciones hechas por los síndicos del Sr. Guillermo

---

[14] Estimamos necesario mencionar que el TPI razonó que estas porciones de terreno fuera de la línea entrecortada que unen los puntos mencionados anteriormente formaban parte de la finca 383 y posteriormente de la finca 5791. En la nota al calce 211 de la *Sentencia*, indicó que tomó conocimiento judicial del caso de expropiación forzosa Civil Núm. E 72-189. En dicho caso, el Ing. Ramón M. Roig hizo unas declaraciones en corte abierta y bajo juramento, las cuales se transcribieron en la *Resolución y Orden* de 2 de junio de 1981. En particular, el Ing. Ramón M. Roig declaró sobre el *Plano de mayo 1922*, confeccionado por él, y dijo que las líneas que están en trazos o entrecortadas son líneas auxiliares de mensura y las continuas son colindancias. En el presente caso, en la *Resolución* que declaró sin lugar las reconsideraciones instadas, se menciona la imputación sobre la consideración de prueba de referencia en alusión al testimonio del Ing. Ramón M. Roig, el TPI aclaró que no adjudicó ningún hecho en controversia utilizando dicho testimonio. "Como bien surge de la propia *Sentencia* del 6 de febrero de 2024 y de las 188 determinaciones de hechos contenidas en la misma, la controversia que giraba en torno a los puntos 38 al 47 que surgen del *Plano de una Finca situado en los barrios Rosado y Aguirre en Salinas P.R.*, firmado por el Ing. Ramon M. Roig, con fecha de mayo 1922, [...] fue resuelta utilizando la prueba documental presentada por las partes del caso de autos". Entradas 1015 y 1046 SUMAC. Valga mencionar que, en otro contexto, el perito de los apelantes, Ing. Jorge Colón Jordán, indicó que las líneas continuas y gruesas se utilizan en la agrimensura para denotar las colindancias. Refiérase al anejo 58, págs. 81 líneas 12-16, 83 líneas 3-5, entrada 891 SUMAC.

González Hernández, no contaban con la debida autorización de las agencias administrativas.

27. Según las cláusulas del contrato de compraventa privado, autorizado por el Tribunal de Quiebras; era la única y exclusiva responsabilidad de los compradores obtener los permisos de segregación expedidos por la Junta de Planificación de P.R. para las fincas adquiridas.

.     .     .     .     .     .     .     .

29. Según la copia certificada de la Escritura Pública de Segregación núm. 44 otorgada el 26 de agosto de 1974, ante el notario Guillermo J. Godreau Marrero, el Sr. Guillermo González Hernández segregó 26 fincas nuevas e independientes, entre ellas la finca La Cuarta y la finca núm. 3753, mejor conocida como La Quinta.

.     .     .     .     .     .     .     .

31. [...] [C]on anterioridad a las 26 segregaciones practicadas en la finca núm. 267 el 26 de agosto de 1974, ya se había segregado y vendido a don Eduardo Lugo Viña una porción de terreno denominada Monte Manglar, hoy finca núm. 383.

32. Asimismo, la [E]scritura [P]ública de segregación núm. 44 del 26 de agosto de 1974, segrega la finca anteriormente descrita [finca Monte del Estado] en las siguientes fincas:

.     .     .     .     .     .     .     .

Parcela "La Cuarta": solar en área "Los Indios", barrio "Las Mareas" del Municipio de Salinas, PR, de área aproximada de 5.5 cuerdas, o sea aproximadamente 22,000 metros cuadrados, colinda por el Norte, con camino privado de la finca; por el Este, con la finca principal; por el Sur, con aguas del [M]ar Caribe; por el Oeste con finca principal solar ocupado por el Sr. Bermúdez. Éste solar tiene 32m de fondo desde el camino hasta el [M]ar Caribe y aproximadamente 680m de frente (andén) con el camino.

.     .     .     .     .     .     .     .

33. La referencia de *finca principal* hecha en las descripciones legales de las fincas mencionadas en el reglón anterior hace referencia a la finca de la cual se segregaron, siendo esta la finca núm. 267, mejor conocida como Monte del Estado.

34. Similarmente, la referencia de *camino privado* hecha en las descripciones legales de las fincas segregadas de la finca núm. 267, hace referencia al *camino privado de la finca Monte del Estado.*

.     .     .     .     .     .     .     .

36. Según la Escritura Pública núm. 20 de segregación y compraventa otorgada el 8 de marzo de 1975, ante el notario Alfredo Ortiz Ortiz, el Sr. Guillermo González Hernández vendió al Sr. Guillermo J. Godreau Marrero y a su esposa doña Josefa Veguilla la parcela de terreno conocida como La Cuarta.

.     .     .     .     .     .     .     .

38. Según la descripción registral de la finca núm. 3752, mejor conocida como La Cuarta, ésta no colinda por ninguna de sus partes con el remanente de la finca núm. 383, mejor conocida como Monte Manglar, ni con la finca núm. 5791, hoy finca núm. 14269.

.     .     .     .     .     .     .     .

40. Según la [E]scritura [P]ública núm. 1 del 12 de febrero de 1976, ante el notario Jorge J. Oppenheimer Méndez, se establece

en su acápite sexto que antes de la otorgación de la mencionada [E]scritura [P]ública y la escrita publica núm. 20 del 8 de marzo de 1975, otorgada ante el notario Alfredo Ortiz Ortiz, los esposos Guillermo J. Godreau Marrero y Josefa Veguilla habían vendido la finca La Cuarta en condominios de una cuarenta y cuatro ava (1/44) partes en común proindiviso.

. . . . . . . .

42. Existe un documento titulado *Contrato Privado Regulando Relaciones entre los Comuneros*, el cual regula las relaciones entre los dueños de participaciones común proindivisas de la finca La Cuarta.

43. Asimismo, existe un plano que lleva por título: *Condominios Los Indios Barrio Las Mareas, Salinas P.R.,* el cual segrega los terrenos en controversia en 44 lotes.

. . . . . . . .

45. El Plano *Condominios Los Indios Barrio Las Mareas, Salinas P.R.,* está certificado por el Ing. Luis E. Rodríguez Peraza.

46. El Plano mencionado en el renglón anterior, no cuenta con ningún tipo de aprobación por parte de alguna agencia administrativa para la segregación y lotificación de los terrenos proyectados.

. . . . . . . .

68. El 22 de septiembre de 1981, la NOAA informó al DRNA que fue aprobada su solicitud de subvención por la suma de $400,000.00 para la compra de los terrenos que serían el Santuario Estuarino de Aguirre.

. . . . . . . .

70. La finca núm. 5791 del municipio de Salinas consta inscrita a favor del ELA, quien adquirió por compraventa con un valor de $516,332.00, en virtud de la [E]scritura [P]ública núm. 31 otorgada en San Juan el 8 de enero de 1982, ante el notario Paul B. Smith Jr., según su inscripción 3.

. . . . . . . .

102. El señor Carlos R. Vega Santos es un agrimensor licenciado bajo las leyes del Estado Libre Asociado de Puerto Rico, con el número de licencia 2203 y miembro en propiedad del Colegio de Ingenieros y Agrimensores de Puerto Rico.

103. El 10 de octubre de 2011, la Universidad de Puerto Rico, Recinto de Mayagüez y el agrimensor Carlos R. Vega Santos suscribieron el Contrato Núm. 2012-000134 para la realización de trabajos de agrimensura en la Reserva Nacional de Investigación Estuarina de Bahía Jobos.

. . . . . . . .

110. La copia literal certificada de la Finca Núm. 5,791 reflejó [ ] los colindantes de esta finca [...].

111. Surge de la Copia Literal Certificada de la Finca Núm. 5,791 que dicha finca se formó mediante segregación de la Finca 383 del tomo veintidós de Salinas.

. . . . . . . .

118. Las tres fases estipuladas en el Contrato Núm. 2015-000068, exigían charlas informativas con personal del Estuario, los vigilantes del DRNA, *vecinos* y personal interesado en la conservación de la Reserva sobre los trabajos realizados y la protección de la misma.

119. Durante la fase núm. 1 se orientó a los residentes y colindantes del Camino Los Indios sobre los trabajos de mensura por realizarse.

120. El agrimensor Vega Santos personalmente se encargó de visitar a los colindantes de la Finca 5,791 que se encontraban allí presentes para informarles sobre la mensura.

121. El 16 julio del 2015 se celebró una reunión en la comunidad.

122. Como parte de los trabajos de investigación, el agrimensor Vega Santos concluyó que existían residentes del Camino de los Indios que carecían de titularidad y/o poseían títulos de propiedad dudosos, que no correspondían a dicha área.

123. Para el 2015, el agrimensor Vega Santos había identificado que la cabida superficial de la finca núm. 5791 del DRNA era menor a la establecida en el Registro de la Propiedad.

.    .    .    .    .    .    .    .    .

127. En el año 2017, el agrimensor Vega Santos comenzó los trabajos relacionados a la rectificación de cabida de la finca 5,791.

128. El 27 de junio de 2017, el agrimensor Vega Santos jura y suscribe la Affidavit núm. 1062 ante la notaria Ciamara Román Pagan, la cual contiene la *Certificación de Mensura* de la finca núm. 5791.

129. El 22 de diciembre de 2017, se suscribió un *Memorandum of Agreeement Between the National Oceanic and Atmospheric Administration and the Puerto Rico Department of Natural and Envioronmental Resources Detailing the state-federal roles in the Management of Jobos Bay National Estaurine Research Reserve.*

130. En el *Memorandum of Agreeement,* la NOAA y el DRNA acordaron las responsabilidades y roles de los diferentes gobiernos en el manejo conjunto de la Reserva Natural de conformidad a las disposiciones de la sec. 315 del *Coastal Zone Management Act of 1972,* según enmendado, 16 USC 1461.

131. Como parte del proceso de rectificación de cabida de la finca núm. 5791, el agrimensor Vega Santos creó un plano titulado: *Rectification of Boundaries for Tract No. 5791,* con su firma, sello y fecha del 26 de noviembre de 2016.

132. El Plano mencionado en el renglón anterior, fue sometido ante el Consorcio CCVS como parte del trámite de la rectificación de cabida de la finca núm. 5791, el 18 de mayo de 2018.

133. Los colindantes propietarios al momento de la mensura lo eran: (1) la Autoridad de Tierras de Puerto Rico; (2) el Departamento de Recursos Naturales y Ambientales; (3) Departamento de la Vivienda; (4) Autoridad de Energía Eléctrica (5) Mar Caribe (6) Municipio de Salinas (7) Milva Vázquez (8) Marcial González Beltrán (9) Sucn. Evaristo Rivera Padín; (10) Nydia Rosario Alvarado; y (11) Seraliza Rodríguez Sastre.

134. El Consorcio CCVS aprobó la referida rectificación de cabida de la Finca 5,791.

135. El 18 de junio de 2019 en San Juan Puerto Rico, se autorizó la [E]scritura [P]ública núm. 50 de rectificación de cabida, ante el notario Juan Carlos Ortiz Arocho, en la cual comparecieron como otorgante de una sola parte el DRNA representado por su Secretaria, Tania Vázquez Rivera.

.    .    .    .    .    .    .    .    .

137. Según la Certificación Registral de la finca núm. 13320, con fecha de expedición del 12 de abril de 2022, la mencionada finca

consta inscrita a favor del DRNA y fue adquirida el 27 de febrero de 2006, para integrarla a la Reserva Nacional de Investigación Estuarina de la Bahía de Jobos.

138. La finca núm. 13320 agrupada con la finca núm. 5791 formaron la finca núm. 14269 de Salinas.

139. El 30 de agosto de 2022, en San Juan Puerto Rico, se autorizó la [E]scritura [P]ública números 51 de agrupación, ante el notario Juan Carlos Ortiz Arocho, en la cual compareció como otorgante de una sola parte el DRNA representado por su Secretaria, Tania Vázquez Rivera. En la misma se agruparon la finca núm. 5791 y la finca núm. 13320.

. . . . . . . .

166. El Ing. Jorge E. Colón Jordán, perito de la parte codemandada, en su informe pericial titulado *Informe sobre Acción Reivindicatoria* con fecha del 30 de agosto de 2022, utilizó varios planos para la ilustración de mapas y diagramas. Entre los planos utilizados, el Ing. Colón Jordán utilizó un plano de mensura titulado *Finca Monte del Estado Propiedad de la Sunc. De Guillermo González, Localizada en el Barrio Aguirre de Salinas, Puerto Rico.*

167. El plano de mensura titulado *Finca Monte del Estado Propiedad de la Sunc. De Guillermo González, Localizada en el Barrio Aguirre de Salinas, Puerto Rico* fue preparado por el Ing. José A. Ramos Rivera. El plano no está firmado y no tiene fecha.

168. El plano mencionado en el renglón anterior ilustra el remanente de la finca núm. 267, mejor conocida como Monte del Estado, al Oeste de la carretera PR-703. Dicho de otra forma, según el plano de mensura de la Finca Monte del Estado, ésta colinda en parte por el Este con la carretera estatal núm. PR-703.

. . . . . . . .

170. El plano titulado: *Vindication Area and Identification of Constructions Over Tract No. 14,269,* preparado por el agrimensor Vega Santos el 15 de junio de 2022, establece el área a reivindicarse y las estructuras que están sitas en el área a reivindicarse.

171. Según la Certificación Registral de la finca núm. 3752 y las escrituras públicas de compraventa de las participaciones de cada uno de los codemandados, la cabida superficial de la finca La Cuarta es de 22,000 metros cuadrados equivalentes a 5.5 cuerdas.

172. Según el plano titulado: *Vindication Area and Identification of Constructions Over Tract No. 14,269,* preparado por el agrimensor Vega Santos el 15 de junio de 2022, el área a reivindicarse ocupada por los codemandados de epígrafe es de 51,463.9371 metros cuadrados equivalente a 13.0938 cuerdas de terreno.

173. Existe una diferencia de 29,463 metros cuadrados equivalente a 7.59 cuerdas de diferencia entre el área ocupada por los codemandados y lo que indican sus títulos de propiedad de las participaciones común proindiviso de la Finca La Cuarta.

174. El plano titulado: *Asbuilt Plan With Overlay of Original Partitions Goemetry Plan*, preparado por el agrimensor Vega Santos el 15 de junio de 2022, ilustra el área en controversia con todas las estructuras muebles e inmuebles en el área para mayo del 2022 y superpone el plano *Condominios Los Indios Barrio Las Mareas, Salinas P.R.*, certificado por el Ing. Luis E. Rodríguez Peraza sobre el área.

175. La tabla titulada *Profundidad de Predios según Plano Original vs. Ocupación Actual*, demuestra una comparación entre la profundidad de los lotes según el plano *Condominios Los Indios Barrio Las Mareas, Salinas P.R.,* y la ocupación actual de los codemandados en el área en controversia.

176. Según el plano mencionado en el reglón anterior, y una tabla titulada *Profundidad de Predios según Plano Original vs. Ocupación Actual,* los solares originalmente identificados en el plano *Condominios Los Indios Barrio Las Mareas, Salinas P.R.,* con los números 25 hasta el 40, exceden la profundidad establecida en el plano original.

.     .     .     .     .     .     .     .

Al tenor de la totalidad de hechos probados, el TPI declaró con lugar la *Solicitud de Sentencia Sumaria* presentada por el Estado, en representación del DRNA. En consecuencia, descartó las peticiones sumarias de los demandados, al igual que desestimó las reconvenciones y demandas de terceros incoadas por aquéllos. Como parte de su dictamen, el foro *a quo* justipreció que la finca **3752**, **La Cuarta**, no se ubica geográficamente en el área ocupada por los demandados; que éstos no satisfacen los requisitos de la prescripción adquisitiva, ordinaria ni extraordinaria. Así, pues, concluyó que el DRNA es el dueño en pleno dominio de la finca **5791**, **Lugo Viña**, ahora finca **14269**, que comprende la Reserva. Por lo tanto, avaló la acción de reivindicación sobre los 51,463.937 metros cuadrados, (13.0938 cuerdas), según identificadas por el DRNA. A estos fines, ordenó el desalojo inmediato de todo poseedor, que sin autorización por parte del DRNA ocupe el área objeto de la acción reivindicatoria, la cual inicia en las coordenadas N: 17.9377655; W: 66.2587637 y se extiende hacia el Sur hasta incluir el predio que ocupa la familia Oppenheimer-Soltero. Asimismo, mandató la demolición y remoción de toda construcción removible y bienes muebles sitos dentro de los terrenos objeto de la reivindicación; y la restauración del área ilegalmente ocupada a su estado original, todo a costa de los demandados y de conformidad con un plan aprobado por el DRNA.

Oportunamente, varios demandados solicitaron la reconsideración de la *Sentencia* y la adición de determinaciones de hechos y conclusiones de derecho; otros se unieron a los pedimentos. El Estado interpuso las

correspondientes oposiciones. El TPI dio por sometido los escritos y declaró no ha lugar las peticiones para variar su dictamen.[15]

Insatisfechos, los apelantes presentaron seis oportunos recursos apelativos. En observancia a nuestro ordenamiento, los casos fueron consolidados por virtud de la *Resolución* emitida por este foro intermedio el 4 de diciembre de 2025.

Cabe mencionar que el recurso TA2025AP00594, instado el 24 de noviembre de 2025, es un <u>duplicado</u> de la apelación TA2025AP00605 presentada el 25 de noviembre de 2025 por la misma parte apelante. La parte apelante explicó que en el caso TA2025AP00594 no logró notificar a tiempo a las partes el recurso apelativo.[16] Tanto la duplicidad como la falta de perfeccionamiento admitida ameritan la desestimación del recurso TA2025AP00594.

Adelante, reproducimos *ad verbatim* los errores señalados por las partes apelantes.

**TA2025AP00595**
*Ramón López Vélez, Grecy Marie Correa Carrasquillo & SLBG*
*Jennifer Alemán, Félix A. Díaz & SLBG*
*Suhail Alemán, Pablo Rodríguez Méndez & SLBG*
*Allan Juhasz*

**PRIMER ERROR**: Erró el Tribunal de Primera Instancia al emitir una Sentencia sin jurisdicción para ello, por falta de parte indispensable.

**SEGUNDO ERROR**: Erró el Tribunal de Primera Instancia al no desestimar el PLEITO debido a la falta de múltiples partes indispensables, en específico la totalidad de los titulares de la finca la CUARTA (Finca 3,752) y al autorizar una acción de reivindicación sobre un predio inscrito sin cumplir con los requisitos procesales que dispone el Art. 34 de la Ley Hipotecaria, 30 L.P.R.A. § 6049.

**TERCER ERROR**: Erró el Tribunal de Primera Instancia al considerar la "Solicitud de Sentencia Sumaria" y/o mociones dispositivas presentadas por el E.L.A. el 24 de agosto de 2023, en contravención a su propia "ORDEN ACLARATORIA PROCESAL" [SUMAC 900], la cual proscribía tomar en consideración mociones dispositivas presentadas posterior al 18 de agosto de 2024.

---

[15] Entradas 1020-1025, 1043-1046 SUMAC.
[16] Véanse, entrada 5 TA2025AP00594 y 3 TA2025AP00605. Para mayor facilidad, en ocasiones, se podría hacer referencia a los documentos presentados en el expediente electrónico TA2025AP00594.

**CUARTO ERROR**: Erró el TPI al no adjudicar en sus méritos la *Solicitud de Sentencia Sumaria* [SUMAC 871] presentada por RLV *et al.* y/o tomar en consideración las defensas levantadas por RLV *et al.* en su *Contestación a Tercera Demanda Enmendada, Reconvención y Demanda Contra Terceros* [SUMAC 398].

**QUINTO ERROR**: Erró el TPI al no celebrar vista a tenor con el Art. 14.1 de la Ley 161 del 2009, y/o no determinar la nulidad de la *Resolución* emitida en el caso 2017-203193-ARC-001487 sobre *Rectificación de Cabida* y enmienda a la descripción registral de la Finca 5,791, la cual fue emitida por la Oficina de Permisos del CCVS y en la cual se autorizó el plano titulado *RECTIFICATION OF BOUNDARIES FOR TRACT NO. 5,791*, así como la enmienda a la descripción registral de la Finca 5,791.

**SEXTO ERROR**: El TPI cometió error manifiesto en la apreciación de la prueba ante su consideración y su dictamen constituye un ataque colateral a una *Orden* del Tribunal Federal de Quiebras.

### TA2025AP00596
*Awildo Jiménez Mercado*
*Alnardo Vázquez Santiago*
*Ángel Benítez Rodríguez*

**PRIMER SEÑALAMIENTO DE ERROR**: Erró el Honorable Tribunal de Primera Instancia al resolver el pleito mediante el mecanismo de sentencia sumaria a pesar de existir controversia de hechos sustanciales que impedían dicho curso de acción.

**SEGUNDO SEÑALAMIENTO DE ERROR**: Erró el Honorable Tribunal de Primera Instancia al hacer determinaciones de hecho sobre asuntos técnicos sin desfilar prueba pericial sobre éstos.

**TERCER SEÑALAMIENTO DE ERROR**: Erró el Honorable Tribunal de Primera Instancia al determinar que el proceso de rectificación de cabida y deslinde cumplió con el ordenamiento jurídico.

**CUARTO SEÑALAMIENTO DE ERROR**: Erró el Honorable Tribunal de Primera Instancia al determinar que no hay falta de parte indispensable resolviendo el pleito sin considerar el efecto de su decisión en el resto de los comuneros no incluidos en el mismo.

### TA2025AP00597
*Rafael Carballo Díaz*
*Cacique Beach Resort, LLC*

**A.** ERRÓ EL TPI AL DICTAR UNA SENTENCIA EN VIOLACIÓN AL DEBIDO PROCESO DE LEY SEGÚN GARANTIZADO POR LA CONSTITUCIÓN DE LOS ESTADOS UNIDOS Y EL ESTADO LIBRE ASOCIADO DE PUERTO RICO.

**B.** ERRÓ EL TPI AL DICTAR SENTENCIA FALTANDO PARTES INDISPENSABLES SIN CUYA PRESENCIA PODRÍA ADJUDICARSE LA CONTROVERSIA.

**C.** ERRÓ EL TPI AL DICTAR SENTENCIA SOBRE UNA PROPIEDAD SOBRE LA CUAL EXISTEN UN DECRETO JUDICIAL FEDERAL QUE LE CONCEDA EL DERECHO DE PROPIEDAD A LAS PARTES.

**D.** ERRÓ EL TPI AL DICTAR SENTENCIA EN VIOLACIÓN A LAS ÓRDENES DE VENTAS DICTADAS POR EL TRIBUNAL DE QUIEBRA FEDERAL Y DEJAR SIN EFECTO LAS MISMAS.

**E.** ERRÓ EL TPI AL NO RECONOCER QUE LAS PARTES Y SUS ANTECESORES ADQUIRIERON DICHOS TERRENOS MEDIANTE LA FIGURA DE LA PRESCRIPCION ADQUISITVA.

**F.** ERRÓ EL TRIBUNAL DE PRIMER INSTANCIA AL RESOLVER UNA CONTROVERSIA JURISDICCIONAL EN CUANTO A LA NOTIFICACIÓN DE SENTENCIA POR EDICTO NOTIFICADA POR EL DRNA EN EL PRESENTE CASO, A LOS DEMANDADOS EN ACCESO [*sic*] DE DIEZ (10) DÍAS POSTERIOR A SU PUBLICACIÓN, LO CUAL ES CONTRARIO A DERECHO CON UNA RESOLUCIÓN QUE ESTE ALEGA, DE QUE LO PLANTEADO POR LA PARTE DEMANDADA ES UNA MANERA CONSULTIVA DE ALEGATO.

### TA2025AP00598
*Alberto E. Pagán Rivera*
*Edgar Cruz Falcón*
*Milagros Martínez Reyes*
*Pablo Vergara Ramos*
*Judith Agnes Rivera Díaz*

**1. Erró** el Tribunal de Primera Instancia al resolver las controversias planteadas mediante el mecanismo de Sentencia Sumaria a pesar de existir controversia sustancial de hechos esenciales para la resolución del caso tales como:

(i) La ubicación de los terrenos en controversia;

(ii) el posible efecto de lo Resuelto por el caso Federal de quiebras y la venta de los terrenos ordenada por dicho caso sobre la Jurisdicción del Tribunal de Instancia sobre la materia del caso;

(iii) la falta de partes indispensables no incluidos que viola los derechos de dichas partes indispensables en la discusión y resolución de asuntos que inciden directamente en su derecho propietario;

(iv) la incautación de las propiedades de los demandados-apelantes de manera irrazonable, arbitraria o caprichosa sin realizar una VISTA en la cual los afectados tengan la oportunidad de ser oídos; el derecho a contra-interrogar y el derecho a examinar la evidencia presentada por la parte contraria. *Salvá Santiago v. Torres Padró*, 2007 JTS 97, Vol. XXX, lo que constituye una clara violación del Debido Procedimiento de Ley.

**2. Erró** el Tribunal de Primera Instancia al resolver las controversias planteadas que afectan directamente los derechos propietarios de los demandados sin realizar una vista en su fondo en la cual se les garantizara a los demandados-apelantes las exigencias del debido proceso de ley el cual exige que todo procedimiento adversativo debe justo y equitativo así como satisfacer los requisitos de: (1) notificación adecuada del proceso, (2) ante un juez imparcial, (3) con oportunidad de ser oído, (4) con derecho a contrainterrogar testigos y examinar la evidencia presentada en su contra, (5) tener asistencia de abogado, y (6) que la decisión se base en la evidencia presentada y admitida en la vista. *Hernández González v. Hon. Izquierdo Encarnación*, 2005 JTS 44, Vol. XXVIII, pág. 1002.

**3. Erró** el Tribunal de Primer Instancia al resolver una controversia jurisdiccional en cuanto a la notificación de *Sentencia* por Edicto notificada por el DRNA en el presente caso, a los demandados en acceso [*sic*] de diez (10) días posterior a su publicación, lo cual es contrario a derecho con una Resolución que éste alega, de que lo planteado por la parte demandada es una manera consultiva de alegato.

### TA2025AP00605

*Julia Soltero Rinaldi de Oppenheimer*
*Julia Milagros Oppenheimer Soltero*
*Rafael Julián Oppenheimer Soltero*
*Ediz María Oppenheimer Soltero*
*Concepción María Oppenheimer Soltero*
*María Elena Oppenheimer Soltero*
*María Jorge Oppenheimer Soltero*

**1. Erró el Tribunal de Primera Instancia** al emitir una Sentencia producto de la resolución de la *Solicitud de Sentencia Sumaria* (SUMAC 891) <u>radicada fuera del término establecido por el propio Tribunal</u>, por la parte demandante Estado Libre Asociado de Puerto Rico. <u>En violación a su propio término</u>, el Tribunal resolvió exactamente como allí lo solicitó el Estado.[17]

**2. Erró el TPI**, en franco contraste, <u>al dictar *Sentencia* sin resolver</u> la Solicitud de Sentencia Sumaria de la aquí compareciente y su esposo, y <u>al no resolver *ninguna* de las solicitudes de los codemandados</u>.[18]

**3. Erró el TPI** <u>al no celebrar vista alguna</u> y dictar Sentencia basándose enteramente en las alegaciones del Estado Libre Asociado en el antedicho documento radicado fuera de término.[19]

**4. Erró el TPI** <u>al permitir la ausencia de partes indispensables en el litigio,</u> como son todos <u>los</u> propietarios en común y proindiviso de la Parcela La Cuarta, lo que hace *<u>nula ab initio</u>* la Sentencia.

.        .        .        .        .        .        .        .

**5. ERRÓ El TPI** al permitir el **procesamiento selectivo** para arremeter "<u>contra unos sí pero contra otros no</u>", en franca violación de las disposiciones de nuestro Tribunal Supremo a esos efectos.

.        .        .        .        .        .        .        .

**6. ERRÓ EL TPI** al permitir el antedicho <u>discrimen</u>, en idénticas circunstancias.

**7. Erró el TPI** al ignorar la evidencia —fehaciente, contundente, inequívoca— de dos (2) <u>certificaciones oficiales</u> que hacen constar que el terreno objeto de este litigio está **fuera** de la Reserva y jamás ha sido parte de ésta.

.        .        .        .        .        .        .        .

[8.] **Erró el TPI <u>al escoger lo *incidental*</u>** de la antedicha certificación en español, las casas, **con lo que dice *<u>ubicación</u>***, *controversia medular del litigio*, **obviando <u>lo medular</u> en ambas certificaciones**: que los terrenos objeto del presente litigio, específicamente los de los codemandados de la Parcela La Cuarta, están *<u>fuera</u>* de la Reserva.

---

[17] La parte apelante no fundamentó el error.
[18] Error no fundamentado.
[19] Error no fundamentado.

[9.] **ERRÓ EL TPI al <u>adjudicar</u>** en su Sentencia y **reafirmar en su Resolución, partiendo de una premisa falsa. Concluyó que, <u>habiéndose designado los terrenos</u> de la Reserva (de la cual, insistimos, no somos parte) "<u>como una Reserva Natural</u> desde 1981, y <u>POR CONSIGUIENTE</u> un bien de dominio público, reiteramos todos nuestros planteamientos emitidos en la Sentencia del 6 de febrero de 2024" (Hecho 85)**.

.      .      .      .      .      .      .      .

[10.] **Erró el TPI** al pasar por alto las disposiciones y garantías del *Tratado de París* que, en su Artículo VIII, estableció que quedaba salvaguardado el estado de Derecho prevaleciente en ese momento, con garantía de la propiedad privada.

.      .      .      .      .      .      .      .

[11.] **ERRÓ EL TPI** <u>al declarar con lugar la acción reivindicatoria</u> en franca violación a la Ley Hipotecaria de Puerto Rico y <u>habiéndose llevado a cabo todos los procesos de manera ilegal, de principio a fin</u>.

.      .      .      .      .      .      .      .

[12.] **Erró el TPI** al ignorar en su Sentencia leyes y reglas procesales, al pretender resolver el señalamiento de <u>incumplimiento con el requisito de notificación de los trabajos de rectificación</u>, en una oración: "... En lo referente a la falta de notificación de los trabajos de rectificación de cabida por parte del Agrim. Vega Santos, los codemandados no tenían derecho a ser notificados por éstos no ser propietarios colindantes".

.      .      .      .      .      .      .      .

[13.] **ERRÓ EL TPI** al no aplicar **la Doctrina de los Actos Propios**, muchas de cuyas instancias están estrechamente ligadas con nuestros señalamientos de <u>INCURIA</u>, a través del litigio.

.      .      .      .      .      .      .      .

[14.] ERRÓ EL TPI al no aplicar la doctrina de <u>INCURIA</u> (LASHES).

.      .      .      .      .      .      .      .

[15.] **ERRÓ EL TPI** al no reconocer **derechos adquiridos**.[20]

[16.] **ERRÓ EL TPI** al ignorar el reclamo de los demandados de **usucapión**, definitivamente aplicable. Como hemos señalado anteriormente, procede tambien la aplicación de la doctrina de derechos adquiridos, la aplicación del "**grandfather clause**".[21]

[17.] **ERRÓ EL TPI** al no aceptar nuestro reclamo de **entrampamiento**.[22]

[18.] **ERRÓ EL TPI** al no aceptar nuestro reclamo de **prescripción**.[23]

[19.] **ERRÓ EL TPI** al no tomar conocimiento judicial del caso federal The United States of America v. Guillermo Godreau, Civil Núm. 77-173, a pesar de haber hecho constar en la Resolución que tomó conocimiento judicial del Caso Civil Núm. E-71-189 del plano (Ing. Ramón Roig).

.      .      .      .      .      .      .      .

[20.] **ERRÓ EL TPI** al dictar Resolución, sin la celebración de una vista, no obstante dejar irresolutos importantes y decisivos señalamientos de los demandados.

---

[20] Error no fundamentado. La parte apelante tampoco enumeró los señalamientos de error del 8 al 21 que así hemos identificado.
[21] Error no fundamentado.
[22] Error no fundamentado.
[23] Error no fundamentado.

.    .    .    .    .    .    .    .

[21.] ERRÓ EL TPI, en lo referente al Islote sin Nombre (Islote Julie y Jorge) al emitir un remedio que excede la declaración de derechos y las consecuentes acción reivindicatoria desalojo solicitadas por la parte demandante en su Demanda y Demandas Enmendadas en el presente litigio.[24]

Antes de continuar, debemos apuntar que, en el recurso apelativo TA2025AP00605, la parte apelante no discutió varias contenciones identificadas como errores.[25] Aun cuando algunos de los señalamientos se encuentran subsumidos en otras apelaciones, de ordinario, los foros apelativos no consideramos aquellos errores no discutidos. La simple alegación de un error, que luego no se fundamenta, no es motivo para revisar, modificar o, de alguna manera, cambiar la decisión del foro judicial impugnado. *Quiñones López v. Manzano*, 141 DPR 139, 165 (1996). En realidad, estos errores se entienden renunciados.[26] [El] "apelante tiene la obligación de poner en posición al foro apelativo de aquilatar y justipreciar el error anotado. Solamente mediante un señalamiento de error y una discusión fundamentada, con referencia a los hechos y a las fuentes de derecho en que se sustenta, podrá el foro apelativo estar en posición de atender los reclamos que se le plantean". *Morán v. Martí*, 165 DPR 356, 366 (2005); véase, además, Regla 16 (C) (1) (f) del Reglamento del Tribunal de Apelaciones, según enmendada, *In re: Enmiendas al Reglamento del Tribunal de Apelaciones*, 2025 TSPR 141, págs. 31-32, 216 DPR __ (2025).

De otro lado, en el trámite apelativo, las partes apeladas presentaron sus correspondientes escritos de oposición, Estado-DRNA, el Consorcio CCVS y el agrimensor Vega Santos, representado por la Oficina del Procurador General. Junto a las comparecencias de los litigantes, el

---

[24] Error no fundamentado.

[25] TA2025AP00605 errores 1-3, 15-18, 21.

[26] En el recurso apelativo TA2025AP00605, por ejemplo, la parte apelante no rebatió de manera alguna las determinaciones de hechos consignadas, sustancialmente fundamentadas y avaladas en derecho y por el expediente, en torno al islote sin nombre, finca 5687. A base de ello, el TPI concluyó en la *Sentencia* y en la *Resolución* emitidas que el predio baldío, unido a tierra firme, está afectado por el dominio público desde el dominio de la corona española sobre el archipiélago de Puerto Rico y, por ende, nunca ha formado parte del patrimonio de la parte apelante, toda vez que resulta imprescriptible e inapropiable. Véanse, determinaciones de hechos 86-101 de la entrada 1015 SUMAC y la entrada 1046; además, anejo 19 entrada 871 SUMAC; anejos 23-25 entrada 873 SUMAC; anejo 66 (apéndice 31) entrada 891 SUMAC; anejos 25 y 27 entrada 903 SUMAC.

expediente electrónico, los dispositivos de memoria y los documentos físicos elevados, el caso quedó perfeccionado y pendiente de resolución.

Luego, el 29 de abril de 2026, el Estado acudió ante nos en auxilio de jurisdicción mediante el escrito intitulado *Solicitud de orden en auxilio de jurisdicción para paralizar provisionalmente movimientos de tierra, rellenos y construcciones en la Reserva Nacional de Investigación Estuarina de Bahía de Jobos*. Denunció que los apelantes habían iniciado nuevas construcciones al final del Camino del Indio, es decir, en terrenos de la Reserva. Invocó la *Sentencia* apelada que decretó la titularidad del predio reivindicado. Apuntó que el terreno en cuestión comprende una zona susceptible de inundaciones y está clasificado como *Distrito PR* (Preservación de Recursos), por lo que se trata de un área especialmente protegida. Mostró su preocupación en cuanto a que las construcciones, realizadas durante el proceso apelativo, agravaban el fraccionamiento del ecosistema de manglar.

En la misma fecha y sin ulterior trámite, dictamos una *Resolución*, mediante la cual ordenamos la inmediata paralización de toda obra de relleno, movimiento de tierras, instalación de verjas, instalación de bienes muebles y/o construcciones removibles o permanentes en el área objeto de controversia.

## II. *Jurisdicción*

### A. *Parte indispensable*

Como cuestión de umbral, abordaremos la cuestión jurisdiccional planteada sobre la ausencia de partes indispensables, en principal alusión a todos los comuneros de **La Cuarta**.[27] Valga mencionar que el TPI resolvió la cuestión en etapas tempranas del caso.[28]

La acumulación indispensable de partes está regulada por la Regla 16 de Procedimiento Civil, 32 LPRA Ap. V, R. 16. Una *parte indispensable*

---

[27] TA2025AP00595 errores 1 y 2; TA2025AP00596 error 4; TA2025AP00597 error 2; TA2025AP00598 error 1 (iii); TA2025AP00605 errores 4-6.
[28] Entrada 89 SUMAC.

es aquella persona cuyos derechos e intereses podrían quedar destruidos o inevitablemente afectados por una sentencia dictada, estando esta persona ausente del litigio. *Pérez Rosa v. Morales Rosado,* 172 DPR 216, 222-223 (2007); *Consejo Cond. Plaza del Mar v. Jetter,* 169 DPR 643, 665 (2006); *Romero v. S.L.G. Reyes*, 164 DPR 721, 733 (2005). A estos efectos, la Regla 16.1 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 16.1, estatuye que toda persona que tuviere un interés común, sin cuya presencia no pueda adjudicarse la controversia, se hará formar parte del pleito, ya sea como parte demandante o demandada, según corresponda. Esta regla aspira evitar que el ausente sea privado de su propiedad sin un debido proceso de ley y "que el remedio adjudicado sea completo". *Romero v. S.L.G. Reyes*, *supra,* págs. 733-734.

Ese *interés* al que hace referencia la norma procesal no es cualquier interés en el pleito, sino que debe ser "de tal orden que impid[a] la confección de un derecho sin afectar los derechos de la persona ausente". *Pérez Rosa v. Morales Rosado, supra,* pág. 223. Se trata, pues, de un interés real e inmediato, no futuro, y no de meras especulaciones. *Torres v. Alcalde Mun. de Carolina,* 135 DPR 108, 121 (1994). Para determinar si se debe acumular una parte, es necesario evaluar los hechos de cada caso. En dicho análisis deben tomarse en cuenta factores, tales como: tiempo, lugar, modo, clase de derechos, alegaciones, prueba, intereses en conflicto, formalidad y resultado. *Sánchez v. Sánchez,* 154 DPR 645, 678 (2001). Se ha dicho que la interpretación de esta norma requiere de un enfoque pragmático, esto es, una evaluación individual a la luz de las circunstancias que se presentan y no de una fórmula rígida para determinar su aplicación. Por ende, los tribunales tienen que hacer un juicioso análisis que incluya la determinación de los derechos de un ausente y las consecuencias de no ser unido como parte en el procedimiento. Es importante determinar si el tribunal podrá hacer justicia y conceder un remedio final y completo sin afectar los intereses del ausente. *Romero v. S.L.G. Reyes, supra,* págs. 732-733.

En ausencia de una parte indispensable, el tribunal carece de jurisdicción para adjudicar las controversias ante sí. *Colón Negrón et al. v. Mun. Bayamón*, 192 DPR 499, 511 (2015); *Bonilla Ramos v. Dávila Medina*, 185 DPR 667, 677-678 (2012). Por ello, no es válida una sentencia dictada sin que se incluya a una persona que reúna los requisitos de parte indispensable. *Unisys v. Ramallo Brothers*, 128 DPR 842, 859 (1991). Debido a lo anterior, el reclamo de falta de parte indispensable es privilegiado e irrenunciable, por lo que puede ser presentado en cualquier etapa procesal o *sua sponte* por los tribunales. *Romero v. S.L.G. Reyes, supra*, pág. 733. Por lo dicho, la parte indispensable tiene que ser traída al pleito con tiempo suficiente para que se pueda defender si así lo desea. *Unisys v. Ramallo Brothers, supra*, pág. 859. Si en efecto la primera instancia judicial reconoce "que está ausente una parte indispensable, se debe desestimar la acción". *Romero v. SLG Reyes, supra,* pág. 734. Sin embargo, la desestimación bajo este fundamento no tendrá el efecto de una adjudicación en los méritos, ni tendrá efecto de cosa juzgada. *Id.*

Relacionado al imputado incumplimiento del Artículo 34 de la Ley Núm. 210 de 8 de diciembre de 2015, según enmendada, *Ley del Registro de la Propiedad Inmobiliaria del Estado Libre Asociado de Puerto Rico*, 30 LPRA sec. 6049 (Ley Núm. 210-2015), intitulado *Presunciones en cuanto a derechos inscritos*, y su relación con el planteamiento de falta de parte indispensable, citamos a continuación la disposición legal:

> A todos los efectos legales se presumirá que los derechos publicados en el asiento de inscripción de cada finca existen y pertenecen a su titular en la forma determinada por el asiento respectivo. También se presumirá que quien tenga inscrito a su favor el dominio de los inmuebles o derechos reales tiene la posesión de los mismos. Estas presunciones admiten prueba en contrario, pero los tribunales cuidarán de que en caso de duda sobre el hecho de la posesión sea reconocido como poseedor el titular inscrito, con reserva de las acciones que puede ejercitar su contradictor en la vía ordinaria correspondiente. En virtud de lo indicado, no podrá ejercitarse ninguna acción contradictoria del dominio de inmuebles o derechos reales inscritos a nombre de un titular determinado, sin que previamente o a la vez se pida en una acción civil o criminal la corrección, nulidad o cancelación de la correspondiente inscripción, cuando proceda.

A la luz de las particularidades de la causa de acción de autos, las alegaciones, la evidencia ofrecida e intereses en conflicto, estimamos que el TPI no erró al dictar *Sentencia* sin la comparecencia de otros comuneros de **La Cuarta**.[29] En realidad, la *Sentencia* no intervino con los derechos de dichos comuneros, quienes no están ocupando los terrenos de la Reserva a ser reivindicados por el DRNA, por lo que era innecesario perturbar sus posesiones.[30] Es inmeritorio el argumento de que se tenía que incoar una acción de corrección, nulidad o cancelación de la inscripción. Ello, porque el dictamen no afectó los derechos dominicales o las participaciones proindivisas de ninguno de los condóminos, ya que no se adjudicaron cuotas, la decisión judicial no cuestionó la titularidad de los demandados sobre **La Cuarta** ni impugnó la corrección de los asientos registrales inscritos de la finca **3752**. Contra los demandados se instó una acción reivindicatoria al imputárseles detentar una cosa ajena; contra los demás comuneros de **La Cuarta** el Estado no tenía reclamación alguna, toda vez que éstos no ocupan el predio sujeto a reivindicación.

En fin, el dictamen atendió el asunto de la ubicación física dentro de la Reserva de comuneros específicos que ostentan títulos de la finca **La Cuarta**. No se trata de *discrimen* o *selectividad*, sino de la inexistencia de un interés común indispensable de los comuneros excluidos del pleito, toda vez que no son poseedores de la cosa, por lo que la acción reivindicatoria y de desalojo no tenía que dirigirse contra ellos. Por el contrario, el dictamen provee un remedio completo a favor del DRNA y en contra de las partes apelantes, sobre una parte determinada de una franja manglar, ubicada en la finca **14269** donde radica la Reserva. En dicho predio no existe una comunidad. Nos reafirmamos en que la *Sentencia* apelada no incide con la naturaleza privada de los títulos propietarios de los apelantes sobre **La Cuarta** y el caso no adolece de partes indispensables. Además, los

---

[29] Véase el listado de los dueños de La Cuarta en el anejo 66 (apéndice 14) entrada 891 SUMAC.

[30] El comunero de La Cuarta, Julio Calcaño Pérez, quien no es parte del pleito, por ejemplo, fue depuesto y afirmó que no tenía nada que proveer al caso. Anejo 1 entrada 953 SUMAC, págs. 8 líneas 3-13, 9 líneas 15-25, 10, 11 líneas 1-17.

apelantes han participado de manera activa en el pleito, a pesar de la ausencia de otros condóminos, precisamente debido a que dichas comparecencias son innecesarias.

De otro lado, se imputa indispensables a los sucesores del fenecido Jorge Oppenheimer Méndez (q.e.p.d.).

En este caso, el dictamen del TPI fue emitido el 6 de febrero de 2024. El 21 de noviembre de 2024, en el primer trámite apelativo, ordenamos la notificación por edicto. El 25 de julio de 2025 falleció Jorge Oppenheimer Méndez. El TPI desconocía sobre dicha muerte debido a la falta de aviso de los implicados. Del expediente surge que la notificación enmendada para la publicación del edicto se emitió el 19 de septiembre de 2025. El edicto se publicó una semana después, el 26 de septiembre de 2025. Transcurridos diez días de la publicación, como mandata la Regla 65.3 (c) de Procedimiento Civil, 32 LPRA Ap. V, R. 65.3 (c), el Estado hizo el envío a los rebeldes por correo certificado e informó el hecho al TPI y a todas las partes el 6 de octubre de 2025.[31]

Por otra parte, el 23 de octubre de 2025, registrado en SUMAC el 30 de octubre de 2025, la también demandada y apelante, Sra. Julia (Julie) Soltero Rinaldi: viuda, albacea, administradora y contadora partidora del causante, informó el hecho de la muerte de su esposo, la existencia de un testamento, el nombre de los seis herederos y solicitó la sustitución de parte. Obvió, empero, incluir la información de contacto de los sustitutos. Al día siguiente, 24 de octubre de 2025, la señora Soltero Rinaldi sometió dos mociones a las 5:01 p.m. registradas en SUMAC el 27 y 30 de octubre de 2025, respectivamente. En la primera de éstas, unió el certificado de defunción de su esposo, en el que se constató el fallecimiento el 25 de julio de 2025. Es decir, tres meses antes de su notificación al TPI, en flagrante incumplimiento con el ordenamiento procesal.

---

[31] Entradas 1015, 1087 y 1091 SUMAC.

A instancia del TPI, el 4 de noviembre de 2025, el DRNA solicitó la producción del testamento, así como las direcciones postales, electrónicas y números de teléfono de los hijos que se expresó eran los herederos del causante, para la correspondiente notificación conforme la Regla 67 de Procedimiento Civil, *Notificación y presentación de escritos*. La *Orden* según solicitada se notificó el 5 de noviembre de 2025. Entonces, los recursos de apelación se instaron el 24 y 25 de noviembre de 2025. Ninguno de los apelantes notificó a los sustitutos, pues supuestamente no conocían las respectivas señas de contacto. El 5 de diciembre de 2025, registrada en SUMAC el día 8 siguiente, la viuda y albacea cumplió el mandato del TPI y sometió copia parcial del testamento del difunto, junto a la información de contacto de los sustitutos. Aseguró que éstos no habían repudiado la herencia.

A esa fecha, el *nisi prius* carecía de jurisdicción para atender la sustitución de parte, solicitada por el Estado, y decretó que no tenía nada que proveer. De hecho, al 8 de diciembre de 2025, esta curia ya había notificado una *Resolución* de trámite.

El 7 de enero de 2026, luego de la gestión infructuosa ante el TPI, el Estado nos solicitó la sustitución de parte, a la que se opuso un grupo de los apelantes. Indicaron que Jorge Oppenheimer Méndez no falleció durante el trámite apelativo. El 20 de enero de 2026, acordamos conceder mediante *Resolución* la petición sobre sustitución de parte.[32]

La Regla 22.1 (b) de Procedimiento Civil, 32 LPRA Ap. V, R. 22.1 (b), dispone:

> Si una parte fallece y la reclamación no queda por ello extinguida, cualquiera de las partes en el procedimiento o sus abogados o abogadas notificarán el fallecimiento al tribunal y a las otras partes dentro del término de treinta (30) días, contados desde la fecha en que se conozca tal hecho. El tribunal, a solicitud hecha dentro de los noventa (90) días siguientes a la fecha de dicha notificación,[33] ordenará la

---

[32] Esta curia modificó el epígrafe y ordenó a la Secretaría a notificar a los sustitutos. Entradas 1099-1107, 1113-1115, 1117-1122 SUMAC TPI y entradas 5-6, 15-16, 29-32 SUMAC TA2025AP00594.

[33] Este plazo es necesario porque no se hereda automáticamente. Se requiere de una declaratoria de herederos o la presentación de la copia certificada de un testamento, con

sustitución de la parte fallecida por las partes apropiadas. Los(Las) causahabientes o representantes podrán presentar la solicitud de sustitución del(de la) finado(a), y dicha solicitud se notificará a las partes en la forma dispuesta en la Regla 67 y a las que no lo sean en la forma que dispone la Regla 4. La demanda se enmendará a los únicos fines de conformar la sustitución e incorporar las nuevas partes al pleito. Transcurrido el término sin haberse solicitado la sustitución, se dictará sentencia desestimando el pleito, sin perjuicio.

La norma sobre sustitución de partes, mientras un caso está activo, "atiende el interés público de que los asuntos en los tribunales se solucionen de forma expedita para evitar el perjuicio que la dilación pueda causar a las partes". *Ruiz Mattei v. Commercial Equipment*, 214 DPR 407, 419 (2024); *Vilanova et al. v. Vilanova et al.*, 184 DPR 824 (2012), que cita a *Echevarría Jiménez v. Sucn. Pérez Meri*, 123 DPR 664, 685 (1989). De esta manera, luego de que se ordene la sustitución, las partes no quedan desprovistas, pues se colocan en "los mismos zapatos" que la parte sustituida. *Pino Development Corp. v. Registrador*, 133 DPR 373, 388 (1993). La realidad es que el trámite procesal de sustitución en nada afecta los derechos sustantivos de las partes. La moción sobre sustitución se notifica a las partes ya incluidas al palio de la Regla 67 de Procedimiento Civil; si no son partes en el pleito que se dirime, se deben emplazar y notificar la solicitud de sustitución de conformidad con la Regla 4 de Procedimiento Civil para adquirir jurisdicción sobre la persona. *Echevarría Jiménez v. Sucn. Pérez Meri, supra,* págs. 686-687.

En suma, en este caso, la *Sentencia*, emitida un año y medio antes del deceso, fue notificada por edicto el 26 de septiembre de 2025. Inactivo el pleito, la viuda, albacea, demandada y apelante informó al TPI la muerte de su esposo, evento que aconteció el 25 de julio de 2025. No obstante, no fue hasta el 5 de diciembre de 2025, registrada en SUMAC el día 8, en que la apelante notificó adecuadamente al TPI toda la información atinente a los sustitutos; es decir: copia parcial del testamento, los nombres e

---

las consabidas representaciones o sustituciones, declaraciones de indignidad o desheredaciones. Por igual, una vez una persona es decretada heredera, ésta tiene derecho a repudiar la herencia.

información de contacto de los sustitutos y la negativa de repudio. Para esa fecha, las apelaciones del título ya habían sido presentadas ante esta curia desde finales de noviembre de 2025.

El 24 de noviembre de 2025, cuando se registró la apelación TA2025AP00594, la señora Soltero Rinaldi nos informó sobre el fallecimiento de su esposo y que comparecía sola.[34] Luego, nos dejó saber acerca de su "cumplimiento" de notificar al TPI lo concerniente a los sustitutos.[35] El Estado solicitó la sustitución y ella no mostró reparo alguno.[36] De hecho, ante el TPI la apelante ya había solicitado la sustitución e incluso denunciado la falta de notificación de los escritos judiciales a los sustitutos, aun cuando ella misma no produjo la información necesaria al TPI.[37] Por ello, fue ante nos que se realizó la sustitución de las partes sustitutas, según nos autoriza la Regla 82 (A), *Sustitución de partes,* del Reglamento del Tribunal de Apelaciones, *In re Aprob. Enmdas. Reglamento TA*, según enmendado, 2025 TSPR 42, pág. 114, 215 DPR __ (2025):

> Si estando pendiente un recurso ante el Tribunal de Apelaciones alguna de las partes falleciere, los herederos, las herederas o la representación legal de la persona fallecida notificará al tribunal de dicho fallecimiento dentro de un término de treinta días contados desde la fecha en que se conozca tal hecho. El tribunal, a solicitud hecha dentro de los seis meses de dicha notificación, ordenará la sustitución de la parte fallecida por la parte apropiada. Si no se hiciere la solicitud de sustitución voluntariamente, la otra parte podrá entonces solicitar que se haga constar en los autos el hecho de la muerte y el pleito seguirá tramitándose en la forma que el tribunal ordene.

Como puede verse, la norma prescrita provee para que, en un plazo de seis meses a partir de la notificación del fallecimiento, se consigne en el expediente la muerte de la parte, se solicite la sustitución, se sustituya por la parte apropiada y se continúe con el trámite del litigio apelativo. Estimamos que la transgresión del ordenamiento reglamentario ante la

---

[34] Entrada 2 SUMAC TA2025AP00594.
[35] Entrada 5 SUMAC TA2025AP00594.
[36] Entrada 15 SUMAC TA2025AP00594. Los apelantes del recurso TA2025AP00595 se opusieron; véase, entrada 16 SUMAC TA2025AP00594.
[37] Entradas 1099 y 1101 SUMAC.

primera instancia judicial y la reclamación acomodaticia posterior constituye una estrategia de litigación cuestionable y contraria a la observancia procesal ordenada y de buena fe que debe permear en los tribunales.

Recuérdese que la representación por derecho propio no exime a las partes de cumplir con las normas de procedimiento. El mero hecho de que la familia Oppenheimer-Soltero comparezca por derecho propio, por sí solo, no le sirve de efugio para el craso incumplimiento con las normas procesales. "Ahora debemos evitar que las partes utilicen la comparecencia por derecho propio como subterfugio para no cumplir con las normas procesales, especialmente aquellas que establecen términos jurisdiccionales o de cumplimiento estricto". *Febles v. Romar,* 159 DPR 714, 722 (2003).

### B. *Notificación por edicto*

Insertamos en la discusión los errores atinentes a la notificación de la publicación del edicto por parte del Estado.[38]

La Regla 65.3 (c) de Procedimiento Civil, 32 LPRA Ap. V, R. 65.3 (c), establece el proceso a seguir en los casos de partes en rebeldía:

> En el caso de partes en rebeldía que hayan comparecido en autos, el Secretario o Secretaria le notificará toda orden, resolución o sentencia a la última dirección que se haya consignado en el expediente por la parte que se autorepresenta o a la dirección del abogado o abogada que surge del registro del Tribunal Supremo para recibir notificaciones, en cumplimiento con la Regla 9. En el caso de partes en rebeldía que fueron emplazadas personalmente y nunca comparecieron, se le notificará la sentencia a la última dirección conocida. En caso de desconocer la última dirección, se procederá a notificar la sentencia por edicto, de la misma forma como si la persona hubiera sido emplazada por edicto, según se describe a continuación. En el caso de partes en rebeldía que hayan sido emplazadas por edicto y que nunca hayan comparecido en autos o de partes demandadas desconocidas, el Secretario o Secretaria expedirá un aviso de notificación de sentencia por edictos para su publicación por la parte demandante. El aviso dispondrá que este debe publicarse una sola vez en un periódico de circulación general en Puerto Rico dentro de los diez (10) días siguientes a su notificación e informará a la parte demandada de la sentencia dictada y del término para apelar. Copia del aviso de notificación de sentencia publicado será notificada a la parte

---

[38] TA2025AP00597 error 6 y TA2025AP00598 error 3.

demandada por correo certificado con acuse de recibo dentro del término de diez (10) días luego de la publicación del edicto a la última dirección conocida del demandado. Todos los términos comenzarán a computarse a partir de la fecha de la publicación del edicto, la cual deberá acreditarse mediante una declaración jurada del (de la) administrador(a) o agente autorizado(a) del periódico, acompañada de un ejemplar del edicto publicado.

En observancia a nuestra determinación en el primer trámite apelativo, el 12 de septiembre de 2025, el Estado presentó *Moción solicitando notificación de sentencia por edicto*.[39] El 19 de septiembre de 2025, el TPI emitió la *Notificación de Sentencia por edicto enmendada*.[40] El edicto se publicó el 26 de septiembre de 2025, dentro del término de diez días, en el periódico de circulación general Primera Hora.

El 1 de octubre de 2025, algunos apelantes instaron *Solicitud para que se enmiende notificación de sentencia por edicto*, para enmendar el término de apelación de 30 a 60 días.[41] A este petitorio se unieron otros apelantes en la *Moción solicitando remedio*.[42]

El 6 de octubre de 2025, el Estado incoó la *Moción en cumplimiento de orden y acreditando publicación de edicto y notificación conforme la Regla 65.3 de procedim*[ie]*nto civil*,[43] en la cual acreditó la publicación del edicto, unió la declaración jurada 109,361 de 30 de septiembre de 2025, ante el notario Luis Rivera Marín, copia del edicto y las notificaciones remitidas a los rebeldes por correo certificado con acuse de recibo realizadas el 29 de septiembre de 2025.[44]

Con relación al plazo para apelar en el aviso de notificación expedido por la Secretaría, el Estado sostuvo que se trató de un defecto oficinesco que ocurrió por inadvertencia de la Secretaría del TPI y que no requería una nueva notificación, sino que los términos apelativos comenzaron a cursar el 26 de septiembre de 2025. El 20 de octubre de 2025, notificada el día

---

[39] Entrada 1083 SUMAC.
[40] Entrada 1087 SUMAC; además, entradas 1085-1086 SUMAC.
[41] Entrada 1088 SUMAC.
[42] Entrada 1092 SUMAC.
[43] Entradas 1089 y 1091 SUMAC.
[44] Anejos 1 y 2 entrada 1091 SUMAC.

22, el TPI dictó una *Resolución* para responder a la contención de los apelantes; allí expresó:

> CONFORME AL EXPEDIENTE SURGE CLARAMENTE, LAS FECHAS DE LOS DICT[Á]MENES JUDICIALES, ASÍ COMO LAS FECHAS EN LAS CUALES SE ENMENDARON Y/O NOTIFICARON. LOS T[É]RMINOS PARA RECURRIR SURGEN DE LAS REGLAS DE PROCEDIMIENTO CIVIL DE PR, ASÍ COMO LAS DISPOSICIONES DEL REGLAMENTO DE LOS TRIBUNALES REVISORES O APELATIVOS.
>
> EN LA MOCIÓN DE LA PARTE DEMANDANTE QUE ES OBJETO DE LA PRES[E]NTE RESOLUCIÓN, SE LE SOLICITA A ESTE TRIBUNAL DE INSTANCIA, DE MANERA **CONSULTIVA,** QUE HAGA UNA DETERMINACIÓN SOBRE LOS T[É]RMINOS PARA RECURRIR DE DICHA DETERMINACIÓN. POR CUANTO, ESTE TRIBUNAL SE LÍMITA A DARSE POR ENTERADO Y NO TIENE NADA QUE DISPONER.[45]

El 23 de octubre de 2025, varios apelantes interpusieron la *Moción solicitando remedio y se aclare término de notificación.*[46] El TPI remitió a las partes a la *Resolución* de 20 de octubre de 2025, antes transcrita.[47] Así, pues, entendió que no era necesaria una nueva notificación y descartó tácitamente las imputaciones de nulidad.

En el caso presente, el tracto antes reseñado confirma que la publicación del edicto obedeció los términos prescritos expeditos en la norma procesal civil. En cuanto a la información sobre el término para apelar que debe contener el edicto, aun cuando en el aviso de notificación expedido por la Secretaría se consignó un término de 30 días en lugar de 60 días, lo cierto es que los apelantes ante nos —quienes no son las partes rebeldes notificadas por el edicto— sí fueron informados de cuándo se publicó el edicto.

La parte en rebeldía es Judie Lieb, por sí y en representación de la Sociedad Legal de Bienes Gananciales conformada con el apelante y compareciente Allan Juhasz. Por su parte, los apelantes, luego de ser notificados de la fecha de publicación del edicto el 26 de septiembre de 2025 —fecha a partir de la cual comienza a cursar el término para

---

[45] Entrada 1096 SUMAC.
[46] Entrada 1097 SUMAC.
[47] Entrada 1098 SUMAC; además, entrada 1116 SUMAC.

apelar— en efecto, acudieron oportunamente ante este foro intermedio, conforme estatuyen las normas procesales de los casos civiles cuando se concurre con el Estado como parte. Incluso, la única parte apelante que compareció por derecho propio fue la primera en presentar el recurso. Consideramos que no existió perjuicio alguno que invalide la notificación según realizada. Los apelantes sabían la fecha de publicación del edicto, por lo que no hubo incertidumbre procesal y se favorecieron de un término más holgado. De hecho, idéntico plazo de 60 días utilizaron en las primeras apelaciones (KLAN202400728, KLAN202400735, KLAN202400736, KLAN202400739 y KLAN202400742). Distinto a la jurisprudencia invocada, *R&G Mortgage v. Arroyo Torres y otros*, 180 DPR 511 (2010), no se ha transgredido el debido proceso de ley de los apelantes, toda vez que el Estado sí les informó a todos los contendientes no rebeldes la fecha de la publicación del edicto, por lo que éstos pudieron ejercer a tiempo su derecho estatutario de apelación.

En *R&G Mortgage v. Arroyo Torres y otros, supra,* págs. 525-526, el Tribunal Supremo expresó:

> [E]s importante aclarar que, aunque la referida regla tampoco dispone que se notifique a las partes acerca de la publicación de los edictos, entendemos que, como parte del debido proceso de ley, ésta debe realizarse. En la situación particular aquí trabada, existen varios codemandados entre los cuales hay uno en rebeldía. Claro está, aquellos que no están en rebeldía podrían beneficiarse de términos más amplios ya que, conforme a la Regla 65.3 (b) de Procedimiento Civil de 1979, éstos tienen que esperar que se publiquen los edictos. Sin embargo, eso conlleva que el demandante tenga la obligación de notificar a los demás codemandados de la publicación de los edictos. Si el tribunal y las partes no se enteran de que la publicación se realizó, se crea un ambiente de incertidumbre que perjudica el proceso y la estabilidad judicial.

### III. *Sentencia Sumaria*

Los apelantes plantean que el foro apelado incidió sobre su debido proceso de ley, al resolver sumariamente el litigio ante sí y no celebrar una vista, aun cuando existen controversias sustanciales, al hacer determinaciones de asuntos técnicos sin el desfile de prueba pericial, apreciar equivocadamente la evidencia y dejar irresolutos varios de sus

señalamientos. Se imputa también error al TPI al atender la petición sumaria del DRNA, por supuestamente presentarla fuera de término.[48]

La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36, gobierna el mecanismo de la sentencia dictada sumariamente. *Batista Valentín v. Sucn. Batista Valentín,* 2025 TPSR 93, 216 DPR __ (2025). La norma procesal permite a los tribunales disponer parcial o totalmente de litigios civiles. *León Torres v. Rivera Lebrón,* 204 DPR 20, 51 (2020). De esta manera, se aligera la conclusión de los pleitos, sin la celebración de un juicio en sus méritos, siempre y cuando no exista una legítima controversia de hechos medulares, de modo que lo restante sea aplicar el derecho. Véase, *Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 676 (2018); *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 109 (2015); *Jusino et als. v. Walgreens,* 155 DPR 560, 576 (2001). En este sentido, un hecho material "es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". *Meléndez González et al. v. M. Cuebas, supra,* pág. 110. Por ello, de existir alguna controversia, ésta "debe ser de una calidad suficiente como para que sea necesario que un juez la dirima a través de un juicio plenario". *Ramos Pérez v. Univisión,* 178 DPR 200, 213 (2010).

La sentencia sumaria se dicta en casos claros. Por lo tanto, si no existe una certeza prístina sobre todos los hechos materiales que motivaron el pleito, no procede que se resuelva el pleito por la vía abreviada. *Pérez Vargas v. Office Depot,* 203 DPR 687, 699 (2021) y los casos allí citados. Por ser éste un remedio de carácter discrecional, "[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a un litigante de 'su día en corte', principio elemental del debido proceso de ley". *Mgmt. Adm. Servs. Corp. v. E.L.A.,* 152 DPR 599, 611 (2000); *León Torres v. Rivera Lebrón, supra,* pág. 44.

---

[48] TA2025AP00595 errores 3-4; TA2025AP00596 errores 1-2; TA2025AP00598 error 2; TA2025AP00605 errores 7-8, 20.

Sobre la revisión *de novo* de un dictamen sumario, este tribunal revisor se encuentra en la misma posición que el foro de primera instancia al determinar si procede o no una sentencia sumaria. Sin embargo, al revisar la determinación del tribunal primario, estamos limitados de dos maneras: (1) únicamente consideramos los documentos que se presentaron ante el foro de primera instancia; y (2) sólo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales. Evaluamos el cumplimiento de los requisitos formales y examinamos el expediente de la manera más favorable hacia la parte que se opuso a la solución abreviada, llevando a cabo todas las inferencias permisibles a su favor, este tribunal debe realizar un examen dual que consiste, primero, en analizar los documentos que acompañan la solicitud de sentencia sumaria y en la oposición, así como aquellos que obren en el expediente del tribunal; y segundo, determinar si el oponente de la moción controvirtió algún hecho material y esencial; o si hay alegaciones de la demanda que no han sido refutadas en forma alguna por los documentos. De encontrar que los hechos materiales realmente están incontrovertidos, procedemos a revisar si el foro judicial impugnado aplicó correctamente el derecho a la controversia. *Meléndez González et al. v. M. Cuebas, supra*, págs. 117-121; *Vera v. Dr. Bravo*, 161 DPR 308, 333 (2004).

Huelga mencionar que la petición de resolver por la vía sumaria no fue exclusiva del DRNA. Además de interponer sus respectivas oposiciones, varias partes apelantes intimaron al TPI para que resolviera conforme sus propias solicitudes sumarias. Es un sinsentido, luego, atribuirle error al TPI por disponer del pleito mediante el mecanismo abreviado, únicamente por no acoger sus pedimentos. Resaltamos que, en relación con las controversias planteadas en las peticiones, éstas configuran asuntos de derecho, afines a la resolución sumaria.[49] Esto, unido a la amplia evidencia documental sometida por todas las partes, confirió al TPI los elementos

---

[49] Véase, por ejemplo, entradas 846, 871, 873-874 SUMAC.

necesarios para acudir al dictamen sumario. En este escenario, en que no hay un hecho material genuinamente controvertido, la falta de una vista en su fondo no transgrede el debido proceso de ley de las partes, sobre todo, cuando éstas se allanaron a la resolución sin juicio a través de sus propias peticiones. Nótese que los hechos esenciales en cuanto al lugar en que están ubicados los apelantes no están en controversia. *La cuestión medular a resolver es, si esa ubicación corresponde a la finca 3752, La Cuarta, o a la finca 5791, Lugo Viña, lo que es adjudicable sumariamente a base de la vasta evidencia documental presentada.*

Somos del criterio que el TPI apoyó sus conclusiones en la totalidad del expediente, luego de analizar los documentos incluidos en las distintas mociones, tanto los que obran en SUMAC como en los físicos presentados en la Secretaría, tal como dicta la Regla 36 de Procedimiento Civil, *supra*. Como mencionamos, se incluyó, entre otros, informes periciales, planos físicos y digitalizados, fotografías de la zona a través del tiempo, certificaciones registrales, con sus tractos, descripciones y colindancias, y escrituras públicas que los litigantes ofrecieron y utilizaron indistintamente. Por lo anterior, no nos persuade que el TPI requiriera de alguna prueba pericial adicional a los informes presentados para dirimir los asuntos en controversia ni que hayan quedado asuntos sin resolver. Ciertamente, no es suficiente un planteamiento genérico o especulativo sobre piezas de evidencia consideradas o descartadas, si éstas no contravienen por su valor probatorio el resto de la prueba en que descansó el discernimiento judicial.

Con relación a las piezas de evidencia supuestamente descartadas, algunos apelantes señalan que el TPI no consideró las presuntas admisiones del Estado acerca de que el Camino del Indio no fue parte de los terrenos adquiridos. En específico, se refieren a las cartas con encabezados del DRNA, en español e inglés, fechadas el 2 de noviembre de 1993 y la del día 16 siguiente, a las que se anejó un plano de la finca **Lugo Viña**. Vistas las misivas, éstas se suscriben a afirmar que el

remanente de la finca **383 o Monte Manglar** es de 120.8141 cuerdas, aluden a un área del Camino del Indio al <u>Oeste</u> y cómo esos poseedores podrían estar infringiendo legislación protectora.

Los fragmentos de las cartas que citamos e impartimos énfasis rezan como sigue:[50]

RESERVA AGUIRRE
CAMINO DEL INDIO

Luego de revisar los documentos en poder del Departamento de Recursos Naturales relacionados con la adquisición de la finca Lugo Viña, puedo certificarle que: De los terrenos de la finca original se dejó un **remanente de 120.8141 cuerdas que no entraron en la transacción**. <u>En este remanente están incluidos</u> una porción rectangular al Norte, una porción irregular al Noroeste, donde existe una comunidad y **al Oeste el área del Camino del Indio**.

<u>En este último predio también existen unos solares</u>, la mayoría con casa de veraneo, los que pueden estar violando la Ley de Puertos de 1886 al invadir la zona marítimo terrestre y/o la franja de vigilancia del litoral.

\# \# \#

CAMINO DEL INDIO
AGUIRRE RESERVE

I HEREBY CERTIFY: That having reviewed the documents in hands of the Department of Natural Resources in relation to the acquisition of the Lugo Viña Farm, a remnant of 120.8141 *cuerdas* of the original farm was not included in the transaction. This remnant includes a rectangular portion to the North, an irregular portion to the Northwest, where a community exists, and the area of Camino del Indio to the West.

In this last piece of land, there are also several lots, most of which have summer houses, that might be in violation of the 1886 Ports Law, by invading the maritime zone and/or the Surveillance Littoral Easement.

\# \# \#

Dear June [Cradick]:

Enclosed is a copy of the document certifying that a remanent of 120.8 cuerdas [*sic*] of the Lugo Viña farm was not included in the original land acquisition transaction. Please note that Camino del Indio is within this remanent and therefore is out of the Reserve.

Las comunicaciones hacen referencia al <u>remanente</u> de la finca **383 o Monte Manglar**, luego de que se segregara la finca **5791 o Lugo Viña**.[51] Después de la segregación, el referido remanente del **Monte Manglar**

---

[50] Anejo 22 entrada 874 SUMAC.
[51] Ver, Anejo 48 entrada 891 o anejo 12 entrada 871 SUMAC.

resultó en una cabida aproximada de 120.8 cuerdas.[52] Dicho remanente se

describe en la Escritura Pública 16 de 8 de septiembre de 1981, ante el

notario Gilberto Torres Flores:

> Rústica – Parcela de forma irregular, remanente de finca de mayor cabida, sita en el barrio Aguirre del término municipal de Salinas, Puerto Rico, con una **cabida superficial de ciento veinte cuerdas con ocho mil ciento cuarentiuna diez milésimas de otra (120.8141)**, equivalente a cuarentisiete (47) hectáreas, cuarentiocho (48) áreas, cuarentisiete (47) centiáreas y veintiuna (21) miliáreas, en lindes por **NORTE**, en varios rumbos y distancias, en parte con terrenos de la Corporación Azucarera de Puerto Rico, en parte con terrenos de la Administración de Terrenos de Puerto Rico, y en parte con la **finca "Lugo Viña", segregada de ésta**; por el **SUR**, en varios rumbos y distancias, en parte con la **carretera estatal número setecientos tres (PR #703)**, en parte con el **Mar Caribe**, en parte con el Mar Negro y en parte con la **finca "Lugo Viña", segregada de ésta**; por el **ESTE**, en varios rumbos y distancias, en parte con la **finca "Lugo Viña" segregada de ésta**, en parte con el Mar Negro y en parte con terrenos propiedad de la Administración de Terrenos de Puerto Rico; y, por el **OESTE** en varios rumbos y distancias, en parte con la **carretera estatal número setecientos tres (PR#703)** en parte con el Mar Caribe, en parte con el Mar Negro, en parte con terrenos de la Corporación Azucarera de Puerto Rico, y en parte con la **finca, "Lugo Viña" segregada de ésta**.[53]

Acerca de la alusión al Camino del Indio, la primera descripción de

la finca **3752 o La Cuarta**, segregada de la finca **267 o Monte del**

**Estado**,[54] consignada en instrumento público (Escritura Pública 44 de 6 de

agosto de 1974, ante el notario Guillermo Godreau Marrero) establece que

**La Cuarta**, <u>excepto por el Sur, colinda con su matriz en los otros tres

puntos cardinales</u>.

> Parcela "La Cuarta": **Solar en área "Los Indios"**, barrio "Las Mareas" del municipio de Salinas, Puerto Rico de área aproximada de **cinco cuerdas y media**, o sea aproximadamente veintidós mil metros cuadrados. Colinda por el **NORTE** con **camino privado de la finca**; por el **ESTE** con la **finca principal**; por el **SUR** con aguas del **Mar Caribe**; por el **OESTE** con **finca principal** solar ocupado por el Sr. Bermúdez. Este solar tiene <u>treinta y dos metros de fondo desde el camino hasta el Mar Caribe y aproximadamente seiscientos ochenta metros de frente (ancho) con el camino</u>.[55]

En cuanto a esta evidencia, distinto a lo argüido, el TPI sí la incluyó

en sus determinaciones de hecho 79 y 80 y fue objeto de discusión en la

---

[52] La cabida original de la finca 383 era de 1,480 cuerdas; véanse, determinación de hecho 8 de la entrada 1015 SUMAC, anejo 31 entrada 873 SUMAC.
[53] Anejo 31 entrada 873 SUMAC.
[54] Anejo 4 entrada 871 SUMAC.
[55] Anejo 59 entrada 891 SUMAC.

*Sentencia* apelada. Además, consideramos que es pobre su valor probatorio para determinar que los apelantes ocupan el predio cuyos títulos ostentan, ya que las cartas hablan de otro predio: el remanente de la finca **383**. Por igual, al evaluar el contenido de las mencionadas misivas y las citadas descripciones registrales, es razonable colegir que, en un plazo de siete años, 1974 y 1981, las colindancias de dos descripciones registrales constatan que el tramo del Camino del Indio que está sito en el remanente de la finca **383 o Monte Manglar** no corresponde al de **La Cuarta**. La finca **3752** colinda al Norte, Este y Oeste con su matriz, la finca **267 o Monte del Estado**; mientras que la finca **383** colinda con tierras del Estado, la carretera estatal PR-703 y la finca Lugo Viña, entre otros puntos colindantes.

Al corroborar con la prueba física que obra en los autos, en especial, el plano de mensura titulado *Finca Monte del Estado Propiedad de la Su[cn]. de Guillermo González, Localizada en el Barrio Aguirre de Salinas, Puerto Rico*, del Ing. José A. Ramos (aunque sin firma), el *Plano de segregación de 1,147.4049 cds. de la finca Lugo Viña*, (sin fecha ni firma, archivado en el DRNA) cuando fue segregada en 1981 y luego adquirida por el Estado en 1982, y el *Plano "asbuilt" del área ocupada* del agrimensor Vega Santos,[56] se muestra la finca **267 o Monte del Estado** ya mermada por las segregaciones al **Oeste** de la carretera estatal PR-703; también se desprende que la finca **5791 o Lugo Viña**, al igual que el remanente de la finca **383**, está al **Este** de la carretera estatal PR-703 y, es en esta zona donde se ubica el área a reivindicar. Por último, llama la atención la observación consignada por el funcionario sobre que las "casas de veraneo" en la zona marítimo terrestre del remanente de la finca **383 o Monte Manglar** podrían estar infringiendo también la Ley de Puertos de 1886. Al respecto, verificamos con las fotos aéreas, entre otras imágenes que obran en los autos, que para ese tiempo no existían estructuras en la zona que

---

[56] Véanse, anejo 66 (apéndices 25-26 y 38) entrada 891 SUMAC.

hoy ocupan los apelantes, sino en la finca **383** segregada;[57] y que el Camino del Indio, el cual interseca la carretera estatal PR-703, no se limita al área en controversia. [58] En fin, las cartas ofrecidas de ninguna manera demuestran la concordancia entre los títulos propietarios de los apelantes y la ubicación de los predios que detentan.

Debemos establecer que no guardamos reparo con la falta de firma en los planos antes mencionados, considerados en el dictamen sumario. La autenticación y admisibilidad de estos planos que adolecen de firma o fecha son superables por virtud de las Reglas de Evidencia 401-402 y 901 (a) (b) (5), 32 LPRA Ap. VI, sobre evidencia pertinente y su relación con la admisibilidad, los requisitos de autenticación o identificación como condición previa y, en particular, la autenticación de escritos antiguos o compilación de datos, cuando éste "tiene por lo menos 20 años a la fecha en que se ofrece y que generalmente es tratado y respetado como auténtico por personas interesadas en conocer su autenticidad, y que al ser descubierto se hallaba en un sitio en que probablemente se hallaría de ser auténtico...". Del mismo modo, las fotos aéreas de la Oficina de Sistemas de Información Geográfica de la Autoridad de Carreteras y Transportación satisfacen los requisitos de autenticación *prima facie*, bajo la Regla 902 (C) de Evidencia, *supra*. Dicha norma versa sobre los documentos públicos firmados por funcionarios.

---

[57] Anejo 66 (apéndice 31) entrada 891 SUMAC; además, anejo 4 entrada 380. Este último anejo consta de imágenes satelitales de Google Earth incluidas por el Estado en la *Tercera Demanda Enmendada*, las cuales pueden autenticarse por la Regla 901 (B) (10) de Evidencia, 32 LPRA Ap. VI, sobre las características distintivas en consideración conjunta con las circunstancias. En el contexto de la autenticación de páginas web, en *Rosado Reyes v. Global Healthcare*, 205 DPR 796, 816 (2020), el Tribunal Supremo pautó que se "puede autenticar una impresión de una página web si un testigo declara en sala o certifica mediante declaración jurada que: (1) ingresó la dirección de Internet (*URL address*) que surge de la impresión de la página web en la fecha y hora indicadas; (2) ingresó a la página web y revisó su contenido, y (3) el contenido de la impresión (*printout*) refleja fiel y exactamente lo que el testigo percibió en la página web".

[58] El agrimensor Vega Santos describe el Camino del Indico como sigue: "En el área del sector Los Indios existe un reconocido camino nombrado Camino del Indio que provenía desde el sector La Playita de Salinas originalmente, aunque hoy día no conecta con este sector a causa de la intrusión de algunos cuerpos de agua. Una vez este camino interseca la carretera estatal PR-703 en dirección Oeste-Este se encuentra de frente con los terrenos de la Finca 5791(LViña), quien es hoy día propiedad del Departamento de Recursos Naturales y Ambientales (DRNA) y de aquí en adelante toma una dirección hacia el Sur-Este. Los terrenos al Este de este camino son los terrenos del DRNA que a su vez componen parte de la Reserva Estuarina de la Bahía de Jobos". Anejo 66 entrada 891 SUMAC.

Acerca de la contención de algunos apelantes en torno a que el Tribunal *a quo* atendió las peticiones abreviadas del DRNA, aun cuando las presentó fuera de término, no tienen razón.

El foro primario dictó una *Orden aclaratoria procesal* en la que apuntó que atendería las mociones presentadas el 18 de agosto de 2023.[59] Del expediente se desprende que el DRNA presentó en esa fecha varias solicitudes sumarias.[60] En la misma fecha, acompañó los anejos mediante la presentación física de los documentos.[61] Entonces, el 23 de agosto de 2023, el foro primario aclaró lo relacionado a la presentación de los anejos.[62] Indicó que todos los documentos en los casos civiles debían ser presentados electrónicamente. De esto no ser posible, instruyó a las partes a presentar en el SUMAC una moción informativa que acreditase la presentación física del documento u objeto en la Secretaría, para que así constara en el expediente electrónico del caso. El 24 y 25 de agosto de 2023, el DRNA presentó las mismas mociones dispositivas, esta vez, descargó en SUMAC los correspondientes documentos de apoyo a sus peticiones sumarias.[63] Luego, en cumplimiento de las directrices impartidas, el 1 de septiembre de 2023, indicó al foro judicial cuáles documentos permanecerían físicamente en la Secretaría.[64] Siendo así, las solicitudes sumarias del DRNA responden a las presentadas el 18 de agosto de 2025; es decir, dentro del plazo dictaminado. Por consiguiente, no incidió el TPI.

### IV. *Rectificación de cabida*

En general, los apelantes imputan nulidad al procedimiento de rectificación de cabida de la finca **5791** y a la correspondiente aprobación del Consorcio CCVS en el caso 2017-203193-ARC-001487.[65] Alegan falta de notificación a los colindantes, así como el incumplimiento al Artículo

---

[59] Entrada 900 SUMAC.
[60] Entradas 853, 855-858, 860-862, 864-865, 869 SUMAC. (Entre otras, la entrada 852 fue desglosada; véase, entrada 867 SUMAC).
[61] Entradas 866 y 868 SUMAC.
[62] Entrada 880 SUMAC.
[63] Entradas 891-894, 896-899, 902-907 SUMAC.
[64] Entrada 919 SUMAC.
[65] TA2025AP00595 error 5; TA2025AP00596 error 3; TA2025AP00597 error 1; TA2025AP00605 error 12.

14.1 de la Ley Núm. 161 de 1 de diciembre de 2009, según enmendada, *Ley para la Reforma del Proceso de Permisos de Puerto Rico* (Ley Núm. 161-2009), 23 LPRA sec. 9024, denominado *Recursos extraordinarios para solicitar revocación de permisos, paralización de obras o usos no autorizados, demolición de obras.* Por ello, aducen haber sufrido daños por parte de los terceros demandados y apelados.

Sobre el articulado invocado de la Ley Núm. 161-2009, éste estatuye, en parte, que una persona afectada en su interés propietario puede "presentar una acción de *injunction, mandamus,* sentencia declaratoria o cualquier otra acción adecuada para solicitar:

> 1) la revocación de una determinación final otorgada, cuya solicitud se haya hecho utilizando información incorrecta o falsa; 2) la paralización de una obra iniciada sin contar con las autorizaciones y permisos correspondientes, o incumpliendo con las disposiciones y condiciones del permiso otorgado; 3) la paralización de un uso no autorizado O de una construcción autorizada mediante permiso, para la cual no se hayan realizado los pagos correspondientes a aranceles, pólizas, arbitrios y sellos; 4) la demolición de obras construidas, que al momento de la presentación del recurso y al momento de adjudicar el mismo no cuenten con permiso de construcción, ya sea porque nunca se obtuvo o porque el mismo ha sido revocado.

Somos de la opinión que la referida disposición no aplica al caso de autos. Aun cuando el TPI subrayó que "la *venta de participaciones indivisas* o *cuotas sobre fincas encaminadas a su desarrollo urbano, sin los permisos correspondientes,* constituye una práctica lesiva a la política pública de planificación que evade la regulación de las lotificaciones"; así como que "las estructuras localizadas en el área a reivindicarse son estructuras que no cuentan con los permisos necesarios para su existencia y desarrollo",[66] el pleito civil no versa sobre la revocación de permisos ni incide sobre los acuerdos privados de los comuneros de **La Cuarta**.

Con relación al Consorcio CCVS, el organismo se limitó a ejercer los deberes ministeriales conferidos, al evaluar y autorizar la petición del DRNA.[67] Un asunto ministerial no conlleva juicio subjetivo por parte de un

---

[66] Entrada 1015 SUMAC.
[67] Anejo 30 entrada 871 SUMAC.

funcionario público o Profesional Autorizado sobre la forma en que se conduce o propone una actividad o acción. Por el contrario, meramente se aplican los requisitos de las leyes o reglamentos a los hechos presentados, pero no interviene un juicio discrecional para llegar a una determinación, ya que la decisión está sujeta al uso de estándares fijos o medidas objetivas. Art. 1.5 (48), 23 LPRA sec. 9011 (48). En este caso, la referida solicitud de rectificación de cabida contó con el aval de cumplimiento de las formalidades de rigor. Las alegaciones de daños contra esta parte, tal como lo resolvió el TPI, son improcedentes.

De otro lado, la Ley Núm. 210-2015, *supra*, dispone una serie de mecanismos dirigidos a establecer concordancia entre el Registro de la Propiedad y la realidad jurídica extrarregistral. Específicamente, el Artículo 182 del estatuto, 30 LPRA sec. 6281, establece:

> La concordancia entre el registro y la realidad jurídica extrar[r]egistral podrá lograrse mediante la inmatriculación de las fincas que no estén inscritas a favor de persona alguna; por la reanudación del tracto sucesivo interrumpido; la rectificación de cabida de la finca; y por la cancelación de cargas y gravámenes.

La cabida o medida superficial de una finca es una de las distintas circunstancias utilizadas para la delimitación de los predios inscritos en el Registro de la Propiedad.[68] A esos propósitos, los Artículos 195-197 de la Ley Núm. 210-2015, *supra*, 30 LPRA secs. 6311-6313, estatuyen el procedimiento de la rectificación de cabida de una finca inscrita y su mensura.

> Artículo 195. *Rectificación de cabida; procedimientos.*
>
> La rectificación de cabida de todas las fincas inscritas podrá hacerse constar en el Registro por cualquiera de los siguientes medios:
>
> 1. Mediante sentencia firme dictada en un procedimiento ordinario de deslinde judicial o fijación de cabida.
>
> 2. Por escritura pública cuando se trate de disminución de cabida irrespectivamente de la cantidad de la disminución o en casos de exceso de cabida no mayor del veinte por ciento (20%) de la cabida registrada. Es requisito indispensable llevar a

---

[68] Véase, L. Rivera Rivera, *Derecho registral inmobiliario puertorriqueño*, 3da. ed. Jurídica Editores, 2012, pág. 391.

cabo una mensura técnica con arreglo a la Ley Núm. 173 de 12 de agosto de 1988 y la Ley Núm. 319 de 15 de mayo de 1938, según enmendadas y a lo dispuesto en el Artículo siguiente. En todo caso de disminución de cabida será preciso acreditar además la autorización de la agencia gubernamental o municipal correspondiente.

. . . . . . . .

Artículo 196. *Mensura de la finca.*

En la mensura de una finca no podrán incluirse parcelas segregadas de ésta, pertenezcan o no al mismo dueño. Dicha mensura deberá tomar como punto de partida la última cabida de la finca que consta en el registro.

Artículo 197. *Mensura de finca, forma de acreditarla.*

La acreditación de la mensura de una finca se hará mediante la certificación de mensura juramentada ante notario expedida por el agrimensor licenciado que la efectuó. Deberá hacer constar los nombres y modo de citación de los propietarios colindantes. Se entenderá por agrimensor licenciado el profesional autorizado por la Ley Núm. 173 de 12 de agosto de 1988, según enmendada, y la Ley Núm. 319 de 15 de mayo de 1938, según enmendada.

Por otra parte, la acción de deslinde sirve para determinar los linderos confundidos de dos predios colindantes. *Ramírez Quiñones v. Soto Padilla,* 168 DPR 142, 157 (2006).[69] El Artículo 830 del Código Civil, 31 LPRA sec. 8133, establece que "[e]l propietario tiene derecho a deslindar y a amojonar su predio, con citación de los dueños de los predios colindantes". La acción es imprescriptible. Art. 831 del Cód. Civil, 31 LPRA sec. 8134.

Conforme nuestro ordenamiento jurídico, la acción de deslinde se distingue por individualizar los inmuebles, sin determinar quién es su dueño ni auscultar la validez o la eficacia de los títulos. *Ramírez Quiñones v. Soto Padilla, supra,* pág. 159. Por ello, resulta harto conocido que la sentencia de deslinde sólo tiene el efecto de precisar las colindancias de las heredades contiguas; y no da ni quita derechos. *Id.,* pág. 158; *Zayas v. Autoridad de Tierras,* 73 DPR 897, 901 (1952); *La O v. Rodríguez,* 28 DPR 636, 638 (1920). Al realizar un deslinde, éste "puede efectuarse por cualquier procedimiento técnico de agrimensura…". Art. 832 del Cód. Civil,

---

[69] El deslinde está regulado por los Artículos 828-831 del Código Civil de 2020, 31 LPRA secs. 8111-8137.

31 LPRA sec. 8135. "A falta de títulos suficientes, el deslinde puede efectuarse por lo que resulta de la posesión en que estén los colindantes". *Id.*

En el caso presente, el agrimensor Vega Santos, debidamente licenciado y colegiado, bajo contratación con el Estado,[70] inició trabajos de investigación y agrimensura que se extendieron por más una década. Entre otros fines, se buscaba delimitar la ubicación de los linderos de la finca **5791** e identificar posibles invasiones sobre los predios de la Reserva.[71] Para la obtención de sus propósitos, el agrimensor Vega Santos evaluó un sinnúmero de planos. Entre éstos, el *Plano de segregación de 1,147.4049 cds. de la finca Lugo Viña* el cual muestra el remanente de la **finca 383**, luego de la segregación de la finca **5791**, ilustrando a la carretera estatal PR-703 al Oeste. Igualmente, examinó certificaciones literales registrales de la finca **Lugo Viña** e indagó documentos de otras agencias, como el Centro de Recaudación de Ingresos Municipales (CRIM), la Autoridad de Acueductos y Alcantarillados y la Autoridad de Energía Eléctrica. Incluso, con el uso de aviones no tripulados (drones), capturó imágenes aéreas de la ocupación actual en el área y así poder cuantificar la cabida total ocupada por los apelantes.

A base de lo anterior, al momento del proceso de mensura, se identificaron y notificaron a los colindantes propietarios de la finca **5791**, a saber: la Autoridad de Tierras de Puerto Rico; el Departamento de Recursos Naturales y Ambientales; el Departamento de la Vivienda; la Autoridad de Energía Eléctrica; el Municipio de Salinas; la Sra. Milva Vázquez; el Sr. Marcial González Beltrán; la Sucn. Evaristo Rivera Padín; la Sra. Nydia Rosario Alvarado; y la Sra. Seraliza Rodríguez Sastre.[72] Esto

---

[70] El agrimensor Vega Santos suscribió varios contratos; véanse, anejo 7 entrada 870 SUMAC; anejos 53-54 entrada 891 SUMAC; y anejos 1, 5-10 entrada 903 SUMAC.
[71] Por ejemplo, el Contrato Núm. 2015-000068, se dividía en tres fases: (1) trabajos de mensura, replanteo y monumentación de linderos entre la Comunidad Las Mareas y la Reserva; (2) trabajos de investigación, mensura y monumentación sobre el Camino del Indio localizado en la Reserva; y (3) trabajos de investigación, mensura, agrupación y monumentación de la Reserva. Véase, anejo 7 entrada 870 SUMAC.
[72] Véase la ubicación de los colindantes en el anejo 66 (apéndices 22 y 35) entrada 891 SUMAC.

es, ninguno de los apelantes figura entre los colindantes propietarios, por lo que no era obligación notificarles del proceso de mensura. Aunque en efecto algunas personas en el Camino del Indio surgieron de los registros del CRIM, lo cierto es que dicho ente ni el pago de contribuciones sobre la propiedad, de haberlas, confieren titularidad. Es decir, estos contribuyentes no han legitimado su titularidad en el sistema del CRIM. De esta forma, el agrimensor Vega Santos no tenía por qué entender que las fincas **3752** y **5791** colindaban. Así explicó el agrimensor Vega Santos:

> CVS  De la investigación del CRIM surge que el CRIM, en una visita de campo, ven residencias y ellos crean un perfil de personas, pero no está sustentando un título. Pero ellos identificaron a varias personas en esa área.[73]

> .   .   .   .   .   .   .   .

> CVS  Por lo que me informó el CRIM, de que obviamente, muchas de esas personas, informalmente estaban allí y ellos levantaron data u otros fueron con, con su información, verdad, puede ser el caso, pero tú no ves esas parcelas debidamente identificadas en el CRIM.[74]

En torno al asunto de los colindantes, debemos mencionar que, como parte de las fases acordadas, el agrimensor Vega Santos personalmente orientó a los residentes y colindantes de **Lugo Viña** sobre los trabajos de mensura, entre otras formas, mediante un cónclave celebrado el 16 de julio de 2015. Para esa fecha, ya se conocía la reducción de la cabida de la finca **5791**¸ cuya rectificación requiere la otorgación de una escritura pública, independientemente de la cantidad.

En armonía con sus hallazgos, el agrimensor Vega Santos generó varios planos e inició las labores vinculadas a la rectificación de cabida. Entre los documentos pertinentes, se incluyó la *Certificación de Mensura*, juramentada el 27 de junio de 2017, ante la notaria Ciamara Román Pagán, testimonio 1,062.[75] El declarante aseveró que, en efecto, "durante el transcurso de cuatro (4) años, desde el año dos mil doce (2012) hasta el año dos mil diecis[é]is (2016) sin que hubiera objeción alguna en el proceso", notificó a los colindantes de la finca **5791**, "por medio de visita

---

[73] Anejo 13 entrada 871, pág. 139 líneas 5-8.
[74] Anejo 13 entrada 871, pág. 153 líneas 5-9.
[75] Anejo 11 entrada 870 SUMAC.

personalizada a cada uno de los colindantes, varias reuniones con el equipo del [DRNA] en la cancha de la Comunidad Las Mareas...". Se elaboró, además, el plano *Rectification of Boundaries for Tract No. 5791*, de 26 de noviembre de 2016, firmado y sellado por el agrimensor Vega Santos.[76] Cumplidos los requisitos de rigor, el Consorcio CCVS aprobó la rectificación de cabida. El 18 de junio de 2019, se autorizó la Escritura Pública 50[77] de rectificación de cabida, ante el notario Juan Carlos Ortiz Arocho, en la cual compareció como otorgante de una sola parte el DRNA. Por lo anterior, al cumplirse los criterios estatuidos para un proceso de rectificación de cabida por disminución, ratificamos la decisión del TPI al refrendar el proceso realizado por el DRNA, por conducto del agrimensor Vega Santos.

De la misma forma, estimamos que el TPI no incidió al avalar el proceso de notificación a los colindantes. El agrimensor Vega Santos demostró que satisfizo las exigencias estatuidas y cumplió a cabalidad con los requisitos impuestos para realizar una mensura y una rectificación de cabida. La ausencia de notificación a los apelantes responde a que ellos no surgieron como propietarios colindantes de la finca **5791**. Así, resolvemos que la desestimación de las alegaciones torticeras en contra del agrimensor Vega Santos debe prevalecer, ya que no se demostró alguna acción ni omisión negligente, uno de los elementos esenciales al imputar responsabilidad civil extracontractual. Véase, el Art. 1802 del Cód. Civil de 1930, 31 LPRA ant. sec. 5141, vigente a los hechos.

### V. *Acción de reivindicación*

En otros señalamientos de error, [78] en esencia, los apelantes impugnan la conclusión eje del caso, sobre que los títulos propietarios que ostentan de **La Cuarta** no corresponden a los predios que ocupan. Aducen que el DRNA incurrió en incuria y ha incautado sus propiedades. Según

---

[76] Anejo 66 (apéndice 35) entrada 891 SUMAC.
[77] Anejo 61 entrada 891 SUMAC.
[78] TA2025AP00598 errores 1 (i) y (iv); TA2025AP00605 errores 9, 11, 13-14.

planteado desde el inicio, la controversia principal se relaciona con la acción de reivindicación.

A través de la acción de reivindicación, se pretende la protección del dominio. *Ramírez Quiñones v. Soto Padilla*, 168 DPR 142, 157 (2006). En los casos de reivindicación, "[e]l propietario que no posee puede ejercitar la acción reivindicatoria contra el poseedor que frente a él no puede alegar derecho que justifique su posesión". Art. 820 del Cód. Civil, 31 LPRA sec. 8101. Implica también probar su título, ya que no puede descansar únicamente en los vicios que tenga el título del demandado. *Ramírez Quiñones v. Soto Padilla, supra*; *Castrillo v. Maldonado*, 95 DPR 885, 891-892 (1968). Por consiguiente, los requisitos para reivindicar son: "(a) el justo título de propiedad del demandante; (b) que la acción se dirija contra quien tiene la cosa en su poder; (c) falta de título del poseedor no propietario que permita seguir en la posesión; y (d) la identificación precisa de la cosa cuya restitución se solicita". Art. 821 del Cód. Civil, 31 LPRA sec. 8102. Véanse, *Pérez Cruz v. Fernández*, 101 DPR 365, 374 (1973); *Amy et al. v. Amy et al.,* 15 DPR 415, 434 (1909). Esto es, "*la finca que reclama es la misma a que se refieren los documentos que dicha parte presente en evidencia para acreditar su justo título de dominio*". (Bastardillas en el original). *Pérez Cruz v. Fernández, supra.* Por virtud de lo anterior, "una sentencia reivindicatoria declara el derecho dominical del demandante y ordena que el demandado le entregue la posesión del objeto". *Ramírez Quiñones v. Soto Padilla, supra*, pág. 158.

Con relación a las fincas involucradas, para una mejor comprensión, reseñamos los eventos relacionados con éstas.[79]

### A. *Finca 5791 – Lugo Viña*

La Certificación 2022-010230-CERT de la finca **267 o Monte del Estado** consigna que ésta nace por posesión del Estado desde la conquista

---

[79] Como referencia, véase el organigrama de segregaciones en el anejo 66 (apéndice 39) entrada 891 SUMAC; así como el anejo 66 (apéndices 1-4, 12, 17, 21-22, 24-26) entrada 891 SUMAC.

de esta Isla por Juan Ponce de León. Por su procedencia, **tiene una servidumbre de andén y salvamento**.[80]

En antaño, la inscripción primera de la finca **267** la describía así:

Rústica - Finca denominada "**MONTE DEL ESTADO**" de una superficie de quinientas cuerdas equivalentes a ciento noventa y seis hectáreas, cincuenta y una áreas y noventa y ocho centiáreas deducidas sesenta hectáreas que comprenden cuatro pertenencias minero salinas concedidas a Don Anecto Caballero denominadas Monserrate y Carmen; radican en la jurisdicción de Salinas en los barrios Pueblo y Aguirre, lindando por el **NORTE** con la hacienda de Cañas de los señores Antonetti de Don Ignacio R. La Fuente antes Lanausse de la sucesión Semidey de Don Vicente Milano y Don Tomás Bernardini; al **SUR** el Mar Caribe; al **ESTE** con la Bahía Negra y tierras de Don Tomás Bernardini y al **OESTE** el Camino de la Playa. **Dicha finca se compone de una gran faja que ocupa la zona marítima** de dicha Salina; y además de los islotes denominados Mata, Ratones, Caracoles, Morrillo o Gran Tierral, Pájaros, Barco, Mata Corsario, Puercos y Convento que lindan todos con el Mar Caribe por los cuatro puntos cardinales y se hallan al frente de dicha zona, teniendo estas la denominación especial de Ensenada de las Muras y Punta Arenas.[81]

La finca **267 o Monte del Estado** se segregó para crear la finca **383 o Monte Manglar**, adquirida por el Sr. Eduardo Lugo Viña Dauró. El predio comprendió la primera descripción siguiente que data de 1899:

Rústica - **MONTE MANGLAR** situado en el término municipal de Salinas, barrios de Rosada y Aguirre, no se expresa la medida superficial de su terreno, [82] pero incluyendo esta[s] aguas manglares y el Islote Puercos; está encerrada y demarcada empezando al Norte en un tocón de tachuelo junto con terrenos de la Salinas Monserrate de Don Anecto Caballero y se sigue la línea al Norte con rumbo al Este y colindancias de la sucesión Benvenutti y de Don Eduardo Salich hasta un tocón o punto de tachuelo en la desembocadura de un caño señal con la hacienda Aguirre; de este punto por el Este; con rumbo al Sur atravesando dicho caño, se costea un pedazo de terreno llamado Colchones,

---

[80] Anejo 2 entrada 871 SUMAC. Actualmente la finca 267 se describe como: "*Rústica: BARRIO PUEBLO de Salinas. Solar: **MONTE DEL ESTADO**. Cabida: 414.28 Cuerdas. Linderos: **NORTE**, con la Hacienda Antonmattei, Elias Godreau y Sucesión Semidey. **SUR**, con tierras de Don Valentín Paoli Antonmattey. **ESTE**, con la "Bahía Negra". Oeste, con el camino de La Playa y aguas del Mar Caribe; comprendiendo además los islotes nombrados "Mata", "Ratones", "Morrillos o Gran Tierra", "Pájaros", "Barco", "Mata Corsario", "Conventos" y parte del i. La finca ha sido objeto de segregaciones y no ha sido descrito su remanente [237.2116 cuerdas] en la actualidad*". El documento "*aclara la colindancia **OESTE** por estar incompleta: con el camino de La Playa y Aguas del Mar Caribe; comprendiendo además los Islotes nombrados "Mata", "Ratones", "Morillos o Gran Tierra", "Pájaros", "Barco", "Mata Corsario", "Conventos" y parte del Islote "Caracoles" que lindan todos por los cuatro puntos cardinales con el Mar Caribe, y se hallan en frente de la Zona Marítima, teniendo la denominación especial de "Ens[e]nada de las Murias" y "Punta Arenas*".
[81] Anejo 35 entrada 891 SUMAC.
[82] Para una idea de sus dimensiones en el siglo XX, en la Escritura Pública 16 de 8 de septiembre de 1981, se dice que la finca 383 estaba "[c]ompuesta de mil cuatrocientos ochenta cuerdas (1480) equivalentes a quinientas una hectáreas, sesentinueve áreas y noventid[ó]s centiáreas]. Luego, en el mismo instrumento, se consignó que "[p]or segregaciones efectuadas la cabida de esta finca ha quedado reducida a mil doscientas sesentiocho cuerdas con dos mil ciento noventa diez milésimas de otra (1,268.2190). Refiérase al anejo 31 entrada 873 SUMAC.

se atraviesa a el [*sic*] caño del mismo nombre hasta la costa del islote Puercos que se continua por toda ella hasta doblarla por la pasa grande, subiéndola por el Oeste con rumbo al Norte, hasta el ángulo último en la llamada Ensenada de las Garzas; de aquí a la punta Nordeste del pedazo de terreno nombrado los Indios, se sigue por su costa Este con rumbo al Sur hasta el extremo último; se dobla este y cortando todo el Sur y el Oeste se llega a otro punto de Tachuelo, y de este al que fue de partida ambas división con Don Anecto Caballero. Sus colindancias por los puntos cardinales son al **NORTE** terrenos de la sucesión de Don Tomás Benvenutti y de Don Eduardo Salich; por el **SUR**, el Mar Caribe; por el **OESTE** la Salina Monserrate de Don Anecto Caballero; por el **ESTE**, la Hacienda Aguirre de la Sucesión Don Ignacio Rodríguez Lafuente y la parte de mar nombrada Bahía de Aguirre.[83]

Transcurridas décadas, durante las cuales se aprobó la Constitución de Puerto Rico en 1952, en observación a la máxima constitucional de la política pública de conservar eficazmente los recursos naturales,[84] el 1 de junio de 1981, el DRNA propuso a la Administración Nacional Oceánica y Atmosférica (NOAA, por sus siglas en inglés) la emisión de fondos federales para adquirir de Aguirre's Share Holder's Liquidating Trust una finca para destinarse como Santuario Estuarino de Aguirre (*Aguirre Estuarine Sanctuary*). Al palio de Sección 315 de la *Ley de Manejo de la Zona Costanera de 1972*, 16 USC sec. 1461, la NOAA aprobó los fondos y condicionó la zona al uso educativo e investigativo, entre otras restricciones de conservación y protección.[85]

El 8 de septiembre de 1981, ante el notario Gilberto Torres Flores, Luce and Company otorgó la Escritura Pública 16 para segregar la finca **Monte Manglar** y crear la finca **Lugo Viña**.[86] El 8 de enero de 1982, mediante la Escritura Pública 1 y ante el notario Paul B. Smith Jr., el Estado adquirió por $516,332.00 la actual finca **5791**, segregada de la finca **383**.[87]

---

[83] Anejo 38 entrada 891 SUMAC. Véase, además, anejo 66 (apéndices 3-4) entrada 891 SUMAC.

[84] Refiérase al Artículo VI, Sección 19, de la Constitución de Puerto Rico, 1 LPRA Tomo 1.

[85] Anejo 1 entrada 380 SUMAC.

[86] Anejo 41 entrada 891 SUMAC.

[87] Anejo 32 entrada 873 SUMAC o anejo 51 entrada 891 SUMAC.

A esa fecha, la finca **5791** comprendía la siguiente configuración registral. Cabe mencionar que, conforme su procedencia, la finca **Lugo Viña** está sujeta a la Ley de Aguas, a la Ley de Puertos, andén y salvamento:

RÚSTICA: Finca de forma irregular, conocida con el nombre **"LUGO VIÑA"**, sita en el barrio Aguirre del término municipal de Salinas, Puerto Rico, con una cabida superficial de mil ciento cuarentisiete cuerdas con cuatro mil cuarentinueve diez milésimas de otra (1,147.4049), equivalente a cuatrocientos cincuenta (450) hectáreas, noventisiete (97) áreas, cincuentinueve (59) centiáreas y setentiocho (78) miliáreas, en lindes por el **NORTE**, en varios rumbos y distancias, en parte con remanente de la finca principal de la cual se segrega, en parte con terrenos propiedad de la Administración de Terrenos de Puerto Rico, en parte con terrenos propiedad de la Autoridad de las Fuentes Fluviales de Puerto Rico antes, hoy la Autoridad de Energía Eléctrica de Puerto Rico, y en parte con el Mar Negro; por el **SUR**, en varios rumbos y distancias en parte con remanente de la finca principal de la cual se segrega, en parte con el Mar Negro, en parte con terrenos propiedad de la Autoridad de las Fuentes Fluviales de Puerto Rico antes, hoy la Autoridad de Energía Eléctrica de Puerto Rico y en parte con el Mar Caribe: por el **ESTE**, en varios rumbos y distancias, con terrenos propiedad de la Autoridad de las Fuentes Fluviales de Puerto Rico antes, hoy la Autoridad de Energía Eléctrica de Puerto Rico, en parte con el Mar Caribe y en parte con el Mar Negro y, por el **OESTE**, en varios rumbos y distancias, en parte con **remanente de la finca principal de la cual se segrega**, en parte con el **Mar Negro**, en parte con **terrenos** propiedad de la Autoridad de las Fuentes Fluviales de Puerto Rico antes, hoy la Autoridad de Energía Eléctrica de Puerto Rico y en parte con el **Mar Caribe**. Esta finca es de naturaleza manglar y consta de varias porciones físicamente separadas entre sí por múltiples cuerpos y caños de agua y por terrenos propiedad de la Autoridad de las Fuentes Fluviales de Puerto Rico antes, hoy la Autoridad de Energía Eléctrica de Puerto Rico.

Una vez establecida la Reserva, la propiedad se administra por virtud de un Memorando de Entendimiento (MOU), entre la NOAA y el DRNA, renovable cada cinco años.[88] Al respecto de la afectación de dominio público y contrario a lo alegado, es meritorio mencionar que, por conducto de la Orden Ejecutiva Núm. OE-2000-69 del 29 de diciembre de 2000, suscrita por el entonces gobernador Pedro Rosselló González, se reconoció el *Plan de Manejo de la Reserva de Investigación Estuarina de la Bahía de Jobos*.[89] Allí se expresó en parte y enfatizamos:

POR CUANTO: La Reserva de Investigación Estuarina de Bahía de Jobos JOBANERR) conocida originalmente como el Santuario Nacional de Bahía de Jobos fue identificada por el

---

[88] Anejo 3 entrada 380 SUMAC.
[89] Véase, entrada 1046. Accedido el 17 de febrero de 2026 de http://app.estado.gobierno.pr/ordenes_ejecutivas/2000/OE-2000-69.pdf.

Programa de Manejo de la Zona Costanera, como una de las veintis[é]is reservas naturales.

POR CUANTO: La Bahía de Jobos es la segunda área de estuario más grande en Puerto Rico. JOBANERR fue designada en septiembre de 1981 mediante un acuerdo entre el Departamento de Recursos Naturales y Ambientales y la Administración Nacional Oceánica y Atmosférica (NOAA).

POR CUANTO: Esta designación estableció a la Bahía de Jobos como el undécimo lugar de interés del Sistema Nacional de Reservas de Investigación Estuarina, según aparece en la Sección 315 de la Ley de Manejo de la Zona Costanera de 1972, según enmendada.

POR CUANTO: Mediante esta designación Puerto Rico reafirmó su compromiso de desarrollar un programa de investigación y educación sobre estuarios, preservando mediante la adquisición en pleno dominio, valiosos bosques costeros de mangles y hábitats relacionados para el beneficio del público en general y asegurando su continua disponibilidad como laboratorios naturales para trabajos de campo que brinden información para la toma de decisiones en asuntos costeros.[90]

Luego de las labores de agrimensura, la cabida de la finca **Lugo Viña** fue rectificada y se **redujo** a 4,345,141.6050 metros cuadrados. La descripción corregida es como sigue:

RÚSTICA: Barrio Aguirre de Salinas. Solar: Irregular. Cabida 1, 105.5227 cuerdas. Linderos: **NORTE**, en varios rumbos y distancias, con terrenos propiedad de la Autoridad de Tierras de Puerto Rico y terrenos del Departamento de Recursos Naturales y Ambientales. **SUR**, en varios rumbos y distancias, con el Mar Caribe. **ESTE**, en varios rumbos y distancias con terrenos propiedad de la Autoridad de Energía Eléctrica de Puerto Rico y en parte con el Mar Caribe. **OESTE**, en varios rumbos y distancias, con terrenos propiedad del Departamento de la Vivienda de la Comunidad Las Mareas identificadas con el número uno (1) y ciento veintiséis (126) con la calle municipal de nombre Galileo, con una faja verde de veinte (20) metros de ancho del Departamento de la Vivienda, con terrenos ocupados por la Sra. Milvia Vázquez, el Sr. Marcial González Beltrán, la Sunc. Evaristo Rivera Padín, la Sra. Nydia Rosario Alvarado, el Municipio de Salinas (Pescadería) y la Sra. Seraliza Rodríguez

---

[90] Véase, además, el enlace https://www.govinfo.gov/content/pkg/FR-2001-05-14/pdf/FR-2001-05-14.pdf, *Federal Register*, Vol. 66, No. 93 (May 14, 2001). 66 Fed. Reg. p. 24,339, en que la Administración Nacional Oceánica y Atmosférica, adscrita al Departamento de Comercio Federal, reconoció la designación de la Reserva en el 1981 al amparo de la sección 315 de la *Ley de Manejo de la Zona Costanera de 1972*, 16 USC sec. 1461, y anunció la aprobación del *Plan de Manejo para la Reserva Nacional de Investigación de Bahía de Jobos 2001-2005.*

Sastre. Finca de forma irregular conocida por el nombre "Lugo Viña" sita en el barrio Aguirre del término municipal de Salinas, Puerto Rico con una cabida superficial equivalente a cuatro millones trescientos cuarenta y cinco mil ciento cuarenta y uno punto seiscientos cinco (4,345,141.6050) metros cuadrados. **Esta finca es de naturaleza manglar** y consta de varias porciones físicamente separadas entre sí, por múltiples cuerpos y caños de agua y por terrenos propiedad de la Autoridad de Energía Eléctrica de Puerto Rico.[91]

Posteriormente, la finca 5791 o **Lugo Viña** se agrupó con la finca **13320** de 59,610.5741 metros cuadrados (15.1666 cuerdas)[92] para formar la actual finca **14269** de 4,404,752.1792 metros cuadrados, cuya descripción registral actual reza así:

RÚSTICA: Finca de forma irregular, conocida con el nombre "Lugo Viña", sita en el barrio Aguirre del término municipal de Salinas, Puerto Rico, con una cabida superficial de mil ciento veinte cuerdas con seis mil ochocientos noventa y tres (1,120.6893) cuerdas, equivalentes a cuatro millones cuatrocientos cuatro mil setecientos cincuenta y dos punto mil setecientos noventa y dos (4,404,752.1792) metros cuadrados, en lindes por el **NORTE** en varios rumbos y distancias con terrenos propiedad de la Autoridad de Tierras de Puerto Rico y terrenos del Departamento de Recursos Naturales y Ambientales; por el **SUR**, en varios rumbos y distancias con el Mar Caribe; por el **ESTE**, en varios rumbos y distancias, con terrenos propiedad de la Autoridad de Energía Eléctrica de Puerto Rico, y en parte con el Mar Caribe; por el **OESTE**, en varios rumbos y distancias con terrenos propiedad del Departamento de Recursos Naturales y Ambientales, con dos (2) parcelas del Departamento de la Vivienda de la Comunidad Las Mareas identificadas con el número uno (1) y ciento veintiséis (126) con la calle municipal de nombre Galileo, con una faja verde de veinte (20) metros de ancho del Departamento de la Vivienda, con terrenos ocupados por la Sra. Milvia Vázquez, el Sr. Marcial González Beltrán, la Sunc. Evaristo Rivera Padín, la Sra. Nydia Rosario Alvarado, el Municipio de Salinas (Pescadería) y la Sra. Seraliza Rodríguez Sastre, con los solares ciento cincuenta y tres (153) al ciento cincuenta y seis (156) de la Comunidad Las Mareas. Esta finca es de naturaleza manglar y consta de varias porciones físicamente separadas entre sí, por múltiples cuerpos y caños de agua y por terrenos propiedad de la Autoridad de Energía Eléctrica de Puerto Rico.[93]

A partir de este tracto, el 15 de junio de 2022, el agrimensor Vega Santos realizó el plano *Vindication Area and Identification of Constructions Over Tract No. 14,269* en el cual estableció las estructuras sitas en el área a reivindicar.[94]

---

[91] Anejo 61 entrada 891 SUMAC, Escritura Pública 50 de 18 de junio de 2019, ante el notario Juan Carlos Ortiz Arocho.
[92] Anejo 2 entrada 891 SUMAC.
[93] Anejo 62 entrada 891 SUMAC, Escritura Pública 51 de 18 de junio de 2019, ante el notario Juan Carlos Ortiz Arocho.
[94] Véanse, anejo 66 (apéndices 35-36 y 38) SUMAC.

## B. *Finca 3752 – La Cuarta*

Sujeta a varias segregaciones, entre éstas la que formó la finca **383 o Monte Manglar**, la finca **267 o Monte del Estado** pasó a manos de Gilberto González Hernández, quien advino propietario.  En esa época, la finca **267** se describía como sigue:

> RÚSTICA: Finca denominada **MONTES DEL ESTADO** de una superficie de cuatrocientas catorce cuerdas con veinte y ocho céntimos de otra de terreno, equivalentes a ciento sesenta y dos hectáreas, ochenta y dos áreas y noventa y una centiáreas, radicada en la jurisdicción de Salinas, barrios Pueblo y Aguirre, colindante por el **NORTE**, con la Hacienda Antomattei, Elías Godreau y Sucesión Semidey; por el **SUR**, con **tierras de don Valentín Paoli Antomattei**, que fueron segregadas de esta finca; por el **ESTE**, con la **Bahía Negra** y por el **OESTE**, con el camino de la Playa y aguas del Mar Caribe. Esta finca está reducida a la cabida que se deja dicha, **por haberse segregado de ella, una porción denominada Monte Manglar** [finca 383], **que fue vendida a don Eduardo Lugo Viñas**, comprendiendo en ella el Islote Puerto y se segregó de ella también una porción de cuatro cuerdas que fueron enajenadas al Gobierno de los Estados Unidos y que comprenden parte del Islote Caracoles, así como también **fue segregada una porción de ochenta y cinco cuerdas, con setenta y dos céntimos de otra, que fueron vendidas a don Valentín Paoli Antomattei** y asimismo fueron segregadas los Islotes "Mata", "Ratones", "Morrillos" o "Gran-Tierra", "Pájaros", "Barco", "Mata Corsario", "Conventos" y parte del Islote "Caracoles" que lindan todos con el Mar Caribe, por los cuatro puntos cardinales y se hallan en frente de la zona marítima, teniendo éstos la denominación especial de "Ensenada de las Muras" y "Punto Arenas", habiéndose verificado esta última segregación, por venta a don José Vélez; quedando luego, actualmente, la superficie que se ha descrito anteriormente.[95]

En cuanto a la finca **3752 o La Cuarta**, durante un proceso de quiebra de Guillermo González Hernández iniciado en la década de 1960, el síndico del caso B-29-63, Garrard Harris, solicitó el 26 de agosto de 1971 autorización al foro judicial federal la venta de unos lotes del deudor.[96] El Tribunal convocó al Departamento de Justicia, entre otras partes, a una audiencia, pero el ente gubernamental no compareció. "No objections were made to the Trustee's motion prior to or at the hearing; however the Trustee's motion requests the incidental segregation of the existing and occupied lots sold and no representative of the Secretary of Justice having appeared, this Court continued the hearing to November 30, 1971,

---

[95] Anejo 59 entrada 891 SUMAC. Véase, además, anejo 66 (apéndices 1-2) entrada 891 SUMAC.

[96] Anejo 34 entrada 871 SUMAC; además, anejo 20 entrada 846 SUMAC o anejo 46 entrada 891 SUMAC.

instructing the Court's Clerk to notify again specifically, among others, the Secretary of Justice, as legal representative of Puerto Rico Planning Board".[97]

El 30 de noviembre de 1971, el Tribunal aprobó las transacciones de los predios vendidos mediante contrato privado "and the individual lots are hereby segregated".[98] Para ello citó el Artículo 297 del derogado Código Civil de 1930[99] y el caso *Rosado v. Registrador*, 71 DPR 553 (1950).[100] Surge del listado anejado que Guillermo Godreau Marrero compró cuatro lotes en el Barrio Playa de Salinas y dos en Mar Blanco, Las Mareas.[101]

Tiempo antes, el 14 y 15 de julio de 1971, Guillermo Godreau Marrero y Frank Palavicini Vázquez, representante de Garrard Harris, suscribieron un contrato privado de compraventa, *Contract of Sale and Purchase*, mediante el cual el primero adquirió por $55,000.00 una parcela del caudal del quebrado.[102] El documento expresaba que **el lote formaba parte de la finca Monte del Estado**, pues nunca se había segregado ni solicitado permiso para tal segregación. La gestión de la inscripción del predio recayó en la discreción del comprador, "sobrentendiéndose que tal inscripción, así como también todos los pasos necesarios y el conformar a

---

[97] Anejo 33 entrada 871 SUMAC; además, anejo 20 entrada 846 SUMAC o anejo 46 entrada 891 SUMAC.

[98] *Id.*

[99] El derogado Artículo 297, *Derechos del dueño del terreno en que se edificare de buena fe*, 31 LPRA ant. sec. 1164, del Código Civil de 1930, disponía:

El dueño del terreno en que se sembrare o plantare de buena fe, tendrá derecho a hacer suya la siembra o plantación, previa la indemnización establecida en los Artículos 382 y 383 de este Código, o a obligar al que plantó, a pagar el precio del terreno, y al que sembró la renta correspondiente.

El dueño del terreno en que se edificare de buena fe tendrá derecho a hacer suya la obra, previo el pago al dueño de la obra del costo de los materiales y la mano de obra, o del costo de reproducción de la misma al momento en que el dueño del terreno ejercitarse su derecho, deduciendo la depreciación, lo que resultare mayor, o a obligar al que fabricó a pagar el precio del terreno.

[100] El recurso gubernativo citado refrendó una segregación avalada por el foro judicial, ya que fue previa a la reglamentación atinente. Ahora bien, el alto foro advirtió en su nota al calce dos que "[n]ada anticipamos sobre un pleito similar al que aquí consideramos en el que estuviera envuelta [*sic*] una cuestión de hecho surgida con posterioridad a la fecha de vigencia del Reglamento sobre Lotificación". El Tribunal Supremo mencionó que la fecha de vigencia del Reglamento sobre Lotificación data del 4 de septiembre de 1944. Por lo tanto, no necesariamente a las casi 100 segregaciones les aplicaba la norma y así lo advertía el contrato de compraventa.

[101] Anejo 34 entrada 871 SUMAC; además, anejo 20 entrada 846 SUMAC o anejo 46 entrada 891 SUMAC.

[102] Anejo 35 entrada 871 SUMAC.

todos los requisitos posibles para tal inscripción, incluyendo [la] segregación del solar...".[103]

El *Contract of Sale and Purchase* describe el solar conocido como **La Cuarta** de la siguiente manera:

> Solar en área "Los Indios", barrio "Las Mareas" del municipio de Salinas, P.R. de área aproximada de **cinco cuerdas y media**, o asea [*sic*] aproximadamente **veintid[ó]s mil metros cuadrados**. Colinda por el **NORTE** con camino privado de la finca; por el **ESTE** con la finca principal; por el **SUR** con aguas del Mar Caribe; por el **OESTE** con finca principal solar ocupado por el Sr. Bermúdez.
>
> Este solar tiene treinta y dos metros de fondo desde el camino hasta el Mar Caribe y aproximadamente seiscientes ochenta metros de frente (ancho) con el camino.[104]

El 26 de agosto de 1974, por virtud de la Escritura Pública 44, ante el notario Guillermo Godreau Marrero, se realizó la segregación de la finca **267 o Monte del Estado** de Guillermo González Hernández en varias parcelas, entre éstas, la finca **3752 o La Cuarta**, propiedad del mismo notario.

> Parcela "La Cuarta": Solar en área "Los Indios", barrio "Las Mareas" del municipio de Salinas, Puerto Rico de área aproximada de **cinco cuerdas y media**, o sea aproximadamente **veintidós mil metros cuadrados**. Colinda por el **NORTE** con camino privado de la finca; por el **ESTE** con la finca principal; por el **SUR** con aguas del Mar Caribe; por el **OESTE** con finca principal solar ocupado por el Sr. Bermúdez. Este solar tiene treinta y dos metros de fondo desde el camino hasta el Mar Caribe y aproximadamente seiscientos ochenta metros de frente (ancho) con el camino.[105]

Eventualmente **La Cuarta** fue inscrita en el Registro de la Propiedad, donde se describe así:

> Número de Catastro: 439-000-010-01. Rústica: BARRIO LAS MAREAS de Salinas. Solar: **Cabida: 22,000 Metros Cuadrados**. Linderos: **NORTE**, con camino privado de la finca. **SUR**, con aguas del Mar [C]aribe. **ESTE**, con la finca principal. **OESTE**, con la finca principal solar ocupado por el Señor Bermúdez. Área Sitio Los Indios. Equivalentes a **cinco cuerdas y medios** [*sic*]. **Se segrega de la finca número 267** inscrita al folio 160 del tomo 22 de Salinas.[106]

---

[103] *Id.*
[104] *Id.*
[105] Anejo 59 entrada 891 SUMAC.
[106] Anejo 4 entrada 871 SUMAC.

La compraventa privada de **La Cuarta** se elevó a la Escritura Pública 20 de 8 de marzo de 1975, ante el notario Alfredo Ortiz Ortiz.[107] Al año siguiente, el 12 de febrero de 1976, el notario Jorge Oppenheimer Méndez autorizó la Escritura Pública 1 para ratificar la transacción de Garrard Harris, así como las compraventas de 1/44 partes en común proindiviso de **La Cuarta** que realizaron Guillermo Godreau Marrero y Josefa Veguilla con varios comuneros. Como la finca **3752** no ha sido objeto de segregaciones en concordia con las leyes y reglamentos de rigor, a instancia propia, los condóminos —quienes han adquirido sus participaciones proindivisas a través de instrumentos públicos— se han atribuido unos lotes específicos mediante contratos privados, con el fin de regular sus relaciones. [108] Asimismo, actualmente hay una diferencia de 29,463 metros cuadrados o 7.59 cuerdas en exceso entre el área ocupada por los apelantes y lo que describen los instrumentos públicos de titularidad o en el Registro de la Propiedad.[109]

Recapitulemos. Como se ha mostrado, una vez la finca **383 o Monte Manglar** se segregó de la finca **267 o Monte del Estado**, resultó sita al **Este** de la matriz. Igual ubicación comprende la finca **5791 o Lugo Viña**. Por virtud de la Escritura Pública 1 de 8 de enero de 1982, ante el notario Paul B. Smith, Jr., el Estado adquirió por compraventa a su dueño la finca **5791** para establecer la Reserva; por ende, un inmueble incompatible con la propiedad privada fuera del Estado. Es improcedente, pues, hablar de incautación. Aun cuando el Camino del Indio se extiende allende al área en controversia, y el devenir de los predios no habría tenido que confligir, no fue así. Ello originó la presente acción civil declaratoria, reivindicación y desalojo contra unos condóminos determinados de **La Cuarta**.

---

[107] Anejo 64 entrada 891 SUMAC.

[108] Véanse, anejos 7-12 entrada 846 SUMAC; anejos 5, 29 entrada 871 SUMAC; anejos 14, 16-18, 20-21 entrada 873 SUMAC; anejos 1-3 entrada 874 SUMAC; anejo 50 entrada 875 SUMAC; anejos 7, 11-12, 31, 66 (apéndice 14) entrada 891 SUMAC. Huelga mencionar que el Artículo 1232 del derogado Código Civil de 1930, 31 LPRA ant. sec. 3453, vigente a los hechos, disponía que "[l]os actos y contratos que tengan por objeto la creación, transmisión, modificación o extinción de derechos reales sobre bienes inmuebles" debían constar en documento público.

[109] Anejo 66 (apéndices 11 y 36) entrada 891 SUMAC.

Se ha mostrado que los lotes de los apelantes, comuneros de la finca **3752**, no están ubicados correctamente como alegan. Cuando se segregó **La Cuarta**, su matriz, la finca **267** colindaba al Sur con las tierras de Valentín Paoli Antomattei, finca 828. [110] En concordia con el plano intitulado *Plano de una Finca situado en los barrios Rosado y Aguirre en Salinas P.R.,* del Ing. Ramón M. Roig y fechado en mayo 1922,[111] este predio, identificado como *Valentín Paoli,* se encuentra al Oeste del camino divisorio y actual carretera estatal PR-703, colindando al Este con la finca **383**. Al Este de la finca **267** estaba la Bahía Negra o el Mar Negro. Se deduce racionalmente que cualquier segregación de la finca **267** no podría situarse al Este del Mar Negro ni de la carretera estatal PR-703.

Por su parte, el ingeniero Colón Jordán, perito de los apelantes, planteó que **La Cuarta** ubica en el sitio correcto. Adujo que la confusión provenía porque el plano intitulado *Finca Monte del Estado Propiedad de la Su[cn]. de Guillermo González, Localizada en el Barrio Aguirre de Salinas, Puerto Rico* del ingeniero José A. Ramos no representaba la totalidad de lo que fue la finca **267**. Dijo que ello incidió en la rectificación del agrimensor Vega Santos, del cual aseguró sin más que no tenía las colindancias correctas.[112] Esta inferencia no se sostiene con la prueba antes descrita.

Concluimos que el DRNA satisfizo los requisitos legales de la acción reivindicatoria. Veamos.

Primero, el DRNA acreditó su justo título propietario sobre el predio ocupado por los apelantes, mediante la descripción del tracto registral de las fincas **267**, **383**, **5791** y **14269**; así como de las escrituras públicas de transmisión de dominio. Ello, luego de un ejercicio de rectificación de cabida, el cual resultó en una disminución de la misma y la fijación de sus linderos. Segundo, el DRNA dirigió la acción contra quienes detentan la cosa ajena, a través de construcciones sitas en los lotes de ciertos

---

[110] Anejo 40 entrada 891 SUMAC.
[111] Anejo 42 entrada 891 SUMAC.
[112] Véanse, anejo 66 (apéndice 23) y anejo 67 entrada 891 SUMAC.

condóminos de **La Cuarta**. Tercero, el DRNA evidenció la ausencia de título que justifique la posesión de los apelantes, toda vez que los títulos propietarios de **La Cuarta** no corresponden a los terrenos ocupados. La finca **3752**, segregada de la finca **267**, colinda con su matriz al Norte, Este y Oeste, ubicándose al Oeste de la carretera estatal PR-703. Esta vía así denominada en la actualidad ha sido la división entre las fincas **267** y **383** desde el siglo XIX cuando era un camino que conducía a Las Mareas. No se evidenció colindancia alguna de la finca **3752** con las fincas **383** ni **5791** ni **14269**, de modo que los títulos de los apelantes describen un lugar distinto del que hoy detentan. Cuarto, el DRNA logró identificar con precisión el predio a reivindicar. A través de planos, fotografías e historial registral, el DRNA demostró los lotes que exceden la profundidad del plano original e invaden el perímetro público costero. Según el plano *Vindication Area and Identification of Constructions Over Tract No. 14,269*, del agrimensor Vega Santos, fechado 15 de junio de 2022, el área a reivindicarse es de 51,463.9371 metros cuadrados, esto es, 13.0938 cuerdas.

En resumen, la prueba documental idónea que obra en autos, en efecto, fija la situación, cabida y linderos de la finca **5791** y precisa el área cuya acción civil se reivindica. Indistintamente de la validez de los títulos propietarios en común proindiviso de los interpelados, lo que no está en controversia, dichos títulos no corresponden a la ubicación geográfica en la cual están sitos físicamente en la finca **5791**.[113] Los lotes que reclaman los apelantes están posicionados en propiedad de la Reserva, sujeta a la reivindicación invocada. Es evidente que la finca **3752**, segregada de la finca **267 o Monte del Estado**, nunca colindó con la finca **383 o Monte**

---

[113] Con relación a la extralimitación territorial, del expediente surge una misiva de 27 de mayo de 2015, entregada personalmente a la familia Oppenheimer-Soltero, de parte del Lcdo. William Veguilla de Jesús, representante legal del demandado Guillermo Godreau Veguilla, en la que se imputa "que usted está haciendo uso en una cantidad de terreno en exceso al que usted posee en la finca La Cuarta, localizada en el Barrio las Mareas, del Municipio de Salinas. No solamente eso, sino que además, sin contar con título para ello, está usurpando terreno perteneciente a la comunidad de bienes de la cual nuestro cliente es parte". Véase, anejo 3 entrada 953 SUMAC; además, anejo 12 entrada 873 SUMAC y anejo 66 (apéndice 11) entrada 891 SUMAC.

**Manglar**; tampoco con la finca **5791 o Lugo Viña**, segregada de aquélla. Nótese, además, que la cabida superficial de la finca **La Cuarta** es de 22,000 metros cuadrados o 5.5 cuerdas. No obstante, existe una diferencia significativa entre el área que *de facto* ocupan los apelantes *vis a vis* lo que consignan sus títulos propietarios sobre **La Cuarta**.[114] Por lo cual, es lógico deducir que los apelantes ocupan terrenos ajenos a sus títulos. Si bien la zona es cambiante debido a sus características fisiográficas, en este caso, no se trata de accesiones naturales, sino de ocupación ilegal a lo largo y ancho de predios del Estado. Incluso el perito de los apelantes, ingeniero Colón Jordán, reconoció que los lotes del 26 al 41 ocupaban terrenos más allá de sus límites.[115] Como se conoce, la acción reivindicatoria es de naturaleza real con eficacia *erga omnes*, recuperatoria y de condena. Por lo tanto, habiendo el DRNA probado su dominio y la posesión indebida de los apelantes sobre un predio específico e identificado, procede la restitución de las tierras públicas. Por consiguiente, no erró el TPI al decretar los derechos demaniales del Estado sobre la Reserva o finca **14269**.

### VI. *Cosa juzgada*

Los apelantes arguyen que los procesos judiciales federales validaron sus posesiones.[116]

En el Código Civil de 2020 no existe una disposición equivalente al antiguo Artículo 1204 del Código Civil de 1930, que establecía la doctrina de cosa juzgada como modo de derrotar las presunciones. Véase, 31 LPRA ant. sec. 3343. Sin embargo, la Regla 6.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 6.3 (p), la cual enumera las distintas defensas afirmativas que la parte demandada debe invocar al presentar una alegación responsiva, so pena de entenderse renunciada, en su inciso (p), estatuye la defensa de cosa juzgada. Al igual que las defensas allí consignadas, estas defensas

---

[114] Véase, *Plano "asbuilt" del área ocupada*, preparado por el agrimensor Vega Santos el 5 de junio de 2022, anejo 66 (apéndice 38) entrada 891 SUMAC, en el que se superpone el plano *Condominios Los Indios Barrio Las Mareas, Salinas P.R.*, de 16 de marzo de 1974 del Ing. Luis E. Rodríguez Peraza. Anejo 12 entrada 873 SUMAC.
[115] Anejo 58, pág. 86 líneas 9-21, entrada 891 SUMAC.
[116] TA2025AP00595 error 6; TA2025AP00597 errores 3-4; TA2025AP00598 1 (ii); TA2025AP00605 error 19.

"abarcan materia sustantiva o materia constitutiva de excusa por la cual el demandado no debe responder a la reclamación instada en su contra". Tribunal Supremo de Puerto Rico, Secretariado de la Conferencia Judicial y Notarial, *Informe de Reglas de Procedimiento Civil*, marzo 2008, pág. 76. Véase *Conde Cruz v. Resto Rodríguez*, 205 DPR 1043, 1064 (2020).

Para que se active la presunción de cosa juzgada en otro juicio, "[...] es necesario que entre el caso resuelto por la sentencia y aquél en que ésta sea invocada, concurra la más perfecta identidad entre las cosas, las causas, las personas de los litigantes y la calidad con que lo fueron". *Municipio de San Juan v. Bosque Real, S.E.*, 158 DPR 743, 769 (2003). Ello así, en interés de poner fin a los litigios y en proteger a los ciudadanos para que no se les someta en múltiples ocasiones a los rigores de un proceso judicial. *Pérez v. Bauzá*, 83 DPR 220, 225 (1961). El efecto de la aplicación de esta doctrina es que la sentencia emitida en un pleito anterior impide que se diriman posteriormente, entre las mismas partes y sobre las mismas causas de acción y cosas, las controversias ya litigadas y adjudicadas, y aquellas que se pudieron haber litigado. Véanse, *Municipio de San Juan v. Bosque Real, S.E.*, 158 DPR 743, 769-770 (2003); *Pagán Hernández v. U.P.R.*, 107 DPR 720, 732-33 (1978); *Mercado Riera v. Mercado Riera*, 100 DPR 940, 950 (1972).

La identidad entre las *cosas* se refiere al "objeto o materia sobre la cual se ejercita la acción". *Lausell Marxuach v. Díaz de Yáñez*, 103 DPR 533, 535 (1975); *A & P Gen. Contractors v. Asoc. Caná*, 110 DPR 753, 764-765 (1981). En cuanto a la identidad de *causa*, ésta se refiere a la razón o motivo de pedir; significa el fundamento u origen de las cuestiones planteadas y resueltas. *Id.*, pág. 765. El requisito de identidad de causas se constituye cuando la nueva acción esté como embebida en la primera o fuese consecuencia inseparable de la misma. *Acevedo v. Western Digital Caribe, Inc.*, *supra*, pág. 464. Con referencia al requisito de la identidad de las *personas* de los litigantes, el mismo se rige por la doctrina de la *mutualidad. Id.*, pág. 465. Es decir, precisa que las partes litigantes hayan

sido las mismas en ambos pleitos, el original y el segundo, o se hallaren en una relación mutua. *Pol Sella v. Lugo Christian,* 107 DPR 540, 550 (1978).

Es importante recalcar que el caso de quiebra de Guillermo González Hernández antes discutido no incide sobre la determinación judicial apelada, porque la adjudicación federal nada decidió acerca de la ubicación de **La Cuarta**. Al fin y al cabo, la finca **383** no era parte de los inmuebles en sindicatura, ya que ésta había sido segregada y adquirida por Lugo Viña décadas antes. Consiguientemente, no prevalece la defensa de cosa juzgada, al no existir identidad de partes ni causas de acción. Esto es, la venta de lotes bajo sindicatura no impide la acción reivindicatoria de terrenos usurpados posteriormente.

Ahora, el pleito de marras no constituye el único conflicto que ha enfrentado **La Cuarta**; examinemos las siguientes determinaciones fácticas no controvertidas en torno al proceso civil *U.S. v. Guillermo Godreau,* 77-173, ante el Tribunal Federal para el Distrito de Puerto Rico:[117]

.    .    .    .    .    .    .    .

58. El 20 de julio de 1977, el Cuerpo de Ingenieros de los EE. UU., por medio del Gobierno de los Estados Unidos presentó una acción en el Tribunal Federal para el Distrito de Puerto Rico, contra: (1) Enrique Báez; (2) Herman Montilla; (3) Rafael de la Torres; (4) Carmelita Miranda; (5) Miguel Almodóvar Rosado; (6) Jorge D. Borri; (7) José A Rosado Ortiz; (8) Roberto Juan García; (9) Luis R. Paraliticci Lizardi; (10) Francisco O. Martín Álvarez; (11) Manuel Seoane; (12) Jorge R. Arce; (13) José Rivera Laboy; (14) Dr. Julio Calcaño; (15) Manuel Santiago Guillermety; (16) Salvador T. Roig; (17) Gilberto Selosse; (18) Héctor M. López; (19) Manuel C. Pérez Faura; (20) Jorge J. Oppenheimer Méndez; (21) Elsie Donhert; (22) Ludgerio Colón; (23) Luis Soler; (24) Francisco Montilla Jr.; (25) Dante Amadis Rodríguez; (26) Eduardo Alvarado; (27) Héctor L. Ruiz; (28) Guillermo Godreau; (29) Armando Sosa; (30) Lorenzo Purcell; (31) Pierre Thyvaert; y (32) otras personas desconocidas.

59. La acción que presentó el Gobierno de los EE. UU., con el número de caso Civil. No. 77-17[3], solicitó al tribunal la imposición de un injunction preliminar y un injunction permanente contra los demandados por la descarga de relleno, material sólido y otros contaminantes en aguas navegables de los EE. UU., sin la autorización del Cuerpo de Ingenieros, localizadas en el Mar Caribe y cerca de la laguna conocida como Mar Negro, en Las Mareas del municipio de Salinas en Puerto Rico.

60. El Gobierno de los EE. UU., en el caso United States of America v. Guillermo Godreau, Jorge J. Oppenheimer Méndez, et al., Civil. No. 77-173, solicitó al tribunal como remedio la

---

[117] Entrada 1015 SUMAC; anejos 6-8 entrada 871 SUMAC; anejos 26-28, 30 entrada 873 SUMAC; anejo 7 entrada 874 SUMAC; anejo 66 (apéndices 32-33) entrada 891 SUMAC.

imposición de multas a los demandados y la imposición de acciones restauración a las áreas afectadas de acuerdo con las directrices de Cuerpo de Ingenieros de los EE.UU.

61. En el 1979, el Cuerpo de Ingenieros obtuvo por parte del tribunal una orden de injunction preliminar y permanente contra los demandados.

62. En el 1981, los demandados del mencionado caso y el Gobierno de los EE.UU., llegaron a un *partial consent judgment*, en el cual los demandados tenían prohibida la continuación del dragado, relleno y actividades relacionadas a la construcción sin los correspondientes permisos por parte del Cuerpo de Ingenieros.

63. Las partes del caso en el caso *United States of America v. Guillermo Godreau, Jorge J. Oppenheimer Méndez, et al.,* Civil. No. 77-173, llegaron a un *Partial Consent Judgment,* sin que el tribunal adjudicara ningún tipo de controversia de hechos o de derecho.

64. Como parte del *Partial Consent Judgment,* se condicionó la otorgación de permisos por parte del Cuerpo de Ingenieros, a la culminación de las labores de restauración plasmadas en el *Partial Consent Judgment.*

65. A estos tipos de permisos se les denominan como *after the fact permits.*

66. Las labores de restauración impuestas por el *Partial Consent Judgment,* nunca fueron completadas por los demandados del caso Civil. No. 77-173.

.    .    .    .    .    .    .    .

Sobre la acción civil anterior, en el que se imputaron violaciones a estatutos federales ambientales, el *Partial (Consent) Judgement* y los dibujos anejados tampoco pueden considerarse para configurar la doctrina de cosa juzgada. Los documentos suministrados no demuestran la existencia de algún dictamen que haya resuelto en los méritos la controversia de la ubicación de **La Cuarta**, a base de la descripción registral de las fincas **3752**, **383** y **5791** para que, en efecto, se pudiese determinar que el lugar que ocupan hoy día los apelantes corresponde a los títulos que ostentan. Simplemente los litigios no comparten la misma identidad de cosa ni causa de acción ni las partes.

Lo mismo aplica al procedimiento administrativo ante el Cuerpo de Ingenieros del Ejército de los Estados Unidos y la Junta de Planificación de Puerto Rico, conforme fue correctamente determinado como hechos probados por el TPI y que los apelantes no controvirtieron:[118]

---

[118] Véanse, entrada 1015 SUMAC; anejo 1 entrada 952 SUMAC; anejos 26-28 entrada 873 SUMAC.

. . . . . . . .

71. En enero de 1988 los predecesores de los intereses legales de los demandados originales del caso federal Civil. No. 77-173—la Asociación de Propietarios de Los Indios, Inc.—, expresaron al Cuerpo de Ingenieros, su intención de realizar los trabajos de restauración impuestos por el *Partial Consent Judgment,* entre ellos la restauración del flujo de agua en el área conocida como Mar Negro.

72. La Asociación de Propietarios de Los Indios, Inc. solicitó al Cuerpo de Ingenieros la otorgación de permisos para las estructuras existentes o las que estaban en proceso de construcción, al igual que los muelles y otras estructuras en la costa.

73. Además, la Asociación de Propietarios de Los Indios, Inc. presentó ante la Junta de Planificación de Puerto Rico (en adelante, "Junta de Planificación") una solicitud de certificación de proyectos consistentes con el Programa de Manejo de la Zona Costanera, para varias estructuras, entre ellas: residencias, muelles y la reconstrucción de un camino en grava.

74. El 31 de agosto de 1988, la Junta de Planificación emitió una determinación en la cual objetó la solicitud que presentó la Asociación de Propietarios de Los Indios, Inc.

75. Las razones expuestas por la Junta de Planificación para no endosar los proyectos propuestos por la Asociación de Propietarios de Los Indios, Inc., fueron los siguientes: (1) localización de los proyectos propuestos dentro de la Reserva Natural Estuarina de la Bahía de Jobos; (2) las áreas donde existen las estructuras constituye un área de riesgo mayor de inundaciones ocasionada por marejadas ciclónicas; (3) las actividades propuestas no van acorde la política pública y los objetivos del Programa de Manejo de la Zona Costanera de Puerto Rico.

76. El 26 de septiembre de 1988, la Asociación de Propietarios de Los Indios, Inc., presentó una apelación a la objeción de la Junta de Planificación, ante el Secretario del Departamento de Comercio Federal.

77. El Secretario del Departamento de Comercio Federal sostuvo la objeción de la Junta de Planificación, al establecer que los apelantes, la Asociación de Propietarios de Los Indios, Inc., no pudieron probar que las actividades propuestas eran consistentes con los objetivos del Programa de Manejo de la Zona Costanera de Puerto Rico.

78. En la conclusión de la decisión del Secretario del Departamento de Comercio Federal se establece que, no habiendo revocado la objeción de la Junta de Planificación, las estructuras residenciales, los muelles, los *bulkheads* o mamparos y el mantenimiento del camino privado no estaban permitidos por las agencias Federales.

. . . . . . . .

De nuevo, el procedimiento no adjudica la ubicación de los apelantes.

Lo que sí es concluyente es la carencia de permisos para las construcciones

ordenadas a eliminar en el caso de autos y el continuo incumplimiento con el *Partial (Consent) Judgment*, en violación del ordenamiento legal.[119]

En referencia al caso estatal *Guillermo J. Godreau et als. v. Estado Libre Asociado de Puerto Rico et als.*, GPE 1998-0037,[120] ocurre lo mismo: nada allí se adjudicó acerca de la ubicación geográfica de los apelantes como aquélla que corresponda a sus títulos propietarios:

.     .     .     .     .     .     .     .

81. En el 1998, el Sr. Guillermo J. Godreau, el Sr. Francisco O. Martín y la Sra. Angélica Teresa Pujals Cintrón, presentaron una acción de injunction preliminar contra el DRNA, caso G PE 1998-0037.

82. En el caso G PE 1998-0037 se alegaba que el DRNA construía un portón de control de acceso en un camino que les pertenecía a los demandantes y que consecuentemente enclavaba las fincas pertenecientes a estos.

83. El 22 de diciembre de 2008, por medio de una Sentencia, el Tribunal de Primera Instancia de Guayama desestimó el caso G PE 1998-0037, por ser este académico. Debido a que el DRNA había cesado la construcción del portón y los demandantes, y otras partes en el caso no tenían interés en continuar dilucidando el caso, el tribunal dictó Sentencia desestimándolo.

84. La *Sentencia* del 22 de diciembre de 2008, que desestimó el caso G PE 1998-0037, fue sin perjuicio a que las partes en un futuro pudieran presentar reclamaciones respecto a los supuestos derechos que las partes reclamaron durante el caso que se desestimó.

.     .     .     .     .     .     .     .

La controversia del pleito surgió por un portón que el DRNA comenzó a construir en propiedad pública. Los comuneros de **La Cuarta** presentaron la demanda de *injunction* al argüir que los terrenos eran privados de la finca **Monte del Estado**. El Tribunal realizó una vista ocular el 10 de noviembre de 1998; tuvo acceso al *Plano de una finca situada en los barrios Rosada y Aguirre de Salinas P.R., Propiedad de la Sucn. de Eduardo Lugo Viña*, de mayo de 1922, realizado por el del Ing. Ramón R. Roig y conservado por el DRNA. Allí, el Estado manifestó que sometería evidencia para probar su justo título. No obstante, al cabo de una década de litigio, la administración

---

[119] De hecho, surge de la *Sentencia*, determinación de hecho 28, que en el 1972, el Cuerpo de Ingenieros emitió numerosas órdenes de cese y desista contra los poseedores de los terrenos en controversia, debido al uso de relleno y construcción de muelles sin la autorización. Entrada 1015 SUMAC.

[120] Véanse, entrada 1015; anejo 15a entrada 846 SUMAC; anejo 16 entrada 874 SUMAC; anejo 41 entrada 875 SUMAC; y anejo 1 entrada 947 SUMAC.

del DRNA de ese momento no continuó con la construcción del portón y, unido a la inactividad procesal, el caso se desestimó, sin perjuicio, a solicitud de varios demandantes.

Esta acción, en parte, descarta las alegaciones de incuria. Como se conoce, la *incuria* se refiere a la "dejadez o negligencia en el reclamo de un derecho, los cuales en conjunto con el transcurso del tiempo y otras circunstancias que causan perjuicio a la parte adversa, opera como un impedimento en una corte de equidad". *Molini Gronau v. Corp. P.R. Dif. Pub.*, 179 DPR 674, 687 (2010), que cita con aprobación a *Comisión Ciudadanos v. G.P. Real Property*, 173 DPR 998, 1020-1021 (2008). Claro, no basta el mero transcurso del tiempo para su aplicación. *Aponte v. Srio. de Hacienda, E.L.A.*, 125 DPR 610, 618 (1990). "[T]ratándose de acciones civiles ordinarias con término prescriptivo señalado en ley, [...] no procede la defensa de incuria". *Id.* En el caso de acciones reales, el término prescriptivo es de 30 años. Art. 1204 (e) del Cód. Civil, 31 LPRA 9496 (e). Claro, los bienes de dominio públicos son inalienables, inembargables e imprescriptibles; por lo tanto, a menos que medie una concesión legal, es impermisible el uso privativo. Art. 240 del Cód. Civil, 31 LPRA sec. 6023.

En la causa de marras, si bien se denota cierta dilación de parte del Estado en el ejercicio de sus derechos demaniales, no aplica la doctrina de incuria en su contra. Tanto la intención de la construcción de un portón, las acciones instadas mediante el agrimensor Vega Santos para delimitar las colindancias y cabida de su propiedad, así como los esfuerzos de la Junta de Planificación en conjunto con el Cuerpo de Ingenieros demuestran lo opuesto a la dejadez planteada.

## VII. *Prescripción adquisitiva*

Como alternativa, algunos apelantes esgrimen la prescripción adquisitiva a su favor.[121]

---

[121] TA2025AP00597 error 5.

La propiedad y los demás derechos sobre los bienes pueden obtenerse por vía de la prescripción adquisitiva o usucapión,[122] con o sin justo título y con o sin buena fe. Arts. 549, 1830, 1840 y 1869 del Cód. Civil de 1930, 31 LPRA ants. secs. 1931, 5241, 5261 y 5280; *Adm. Terrenos v. S.L.G. Rivera-Morales*, 187 DPR 15, 26 (2012). Mediante la figura de la usucapión se adquiere un derecho a favor de una persona, mientras se extingue el derecho de otra. *Silva Wiscovich v. Weber Dental Mfg. Co.*, 119 DPR 550, 554 (1987). Siempre que el objeto o el derecho sea susceptible de apropiación por un tiempo determinado, según las condiciones que dicta la ley, el efecto de la usucapión constituye la adquisición del dominio. *Adm. Terrenos v. S.L.G. Rivera-Morales, supra*; *Bravman, González v. Consejo Titulares*, 183 DPR 827, 838 (2011).

En lo que compete a este caso, en que los títulos propietarios de los apelantes no corresponden a los predios en posesión,[123] la doctrina civilista reconoce la usucapión extraordinaria. *Adm. Terrenos v. S.L.G. Rivera-Morales, supra*, pág. 27. Si bien la prescripción adquisitiva extraordinaria prescinde de la buena fe y el justo título, sí exigía como requisitos la posesión ininterrumpida, pública, pacífica y en concepto de dueño, durante al menos treinta años. Arts. 1841 y 1859 del Cód. Civil de 1930, 31 LPRA ants. secs. 5262 y 5280*; Sánchez González v. Registrador*, 106 DPR 361, 375. Es sabido que el tipo de posesión que se exige para poder adquirir el dominio de un bien inmueble mediante la prescripción adquisitiva ordinaria o extraordinaria es la posesión civil. *Adm. Terrenos v. S.L.G. Rivera-Morales, supra*, pág. 29. El Art. 360 del Código Civil de 1930, 31

---

[122] La Ley Núm. 55-2020 adoptó el nuevo Código Civil de Puerto Rico, y su vigencia se fijó a partir del 28 de noviembre de 2020. Toda vez que los hechos del presente caso tienen su génesis en momentos previos a la vigencia del nuevo cuerpo legal, procede la aplicación de las disposiciones del derogado Código Civil de 1930 y su jurisprudencia interpretativa. Ello es cónsono con el Artículo 1814 del Código Civil de 2020, *Términos prescriptivos, de caducidad y usucapión*, 31 LPRA sec. 11719, que establece: Los términos prescriptivos, de caducidad o de usucapión que estén transcurriendo en el momento en que este Código entre en vigor, tienen la duración dispuesta en la legislación anterior; pero si el término queda interrumpido después de la entrada en vigor de este Código, su duración será la determinada en éste".

[123] Conforme con el Artículo 1853 del Código Civil de 1930, 31 LPRA ant. sec. 5274, el título debe ser verdadero y válido. El justo título debe probarse; no se presume nunca. Art. 1854 del Cód. Civil de 1930, 31 LPRA ant. sec. 31 LPRA sec. 5275.

LPRA ant. sec. 1421, definía la "posesión civil" como la tenencia de una cosa y el disfrute de un derecho, unido a la intención de hacer suya la cosa o el derecho.[124]

Salvo las excepciones establecidas por el ordenamiento, la usucapión extraordinaria puede perfeccionarse incluso contra un título inscrito. *Adm. Terrenos v. S.L.G. Rivera-Morales, supra*, pág. 30. Así, pues, en *Dávila v. Córdova, infra*, nuestro Tribunal Supremo acotó:

> [P]ara que se produzca la prescripción adquisitiva extraordinaria que establece el [A]rt. 1859 del Código Civil de Puerto Rico [de 1930], deben exigir nuestros tribunales de justicia la prueba de los siguientes hechos: (1) una posesión continuada durante treinta años sobre el inmueble, (2) por haberla así tolerado el dueño del inmueble, (3) ya que el prescribiente ha entrado en posesión del inmueble sin autorización, permiso o licencia otorgados por el dueño o en virtud de contrato celebrado con el dueño, (4) cuya posesión ha mantenido el poseedor en concepto público de dueño, de acuerdo con la creencia colectiva de la comunidad en que vive, no en virtud de la creencia propia que pueda tener el poseedor de ser el dueño del inmueble poseído, y (5) cuya posesión resulte además pública, pacífica, y (6) sin que se haya interrumpido naturalmente, o sea, por abandono de la cosa por el poseedor, por más de un año, o civilmente, en virtud de diligencia judicial o notarial, o por un reconocimiento expreso o tácito del derecho del dueño hecho por el poseedor, antes de haber transcurrido los treinta años durante los cuales se consuma la prescripción, y (7) sin que el poseedor haya renunciado expresa o tácitamente a su título por prescripción por alguna causa que resulte eficaz en derecho para tal renuncia, después de consumada la prescripción extraordinaria. *Dávila v. Córdova*, 77 DPR 136, 150-151 (1954); refrendado en *Adm. Terrenos v. S.L.G. Rivera-Morales, supra*, págs. 28-29.

Ahora, es harto conocido que un bien de dominio público como la Reserva goza de una tutela diferente al resultar inembargable, imprescriptible e inalienable. Este tipo de bien inmueble está fuera del comercio porque no se puede enajenar ni poseer privadamente por disposición de ley. Cabe destacar que, "lo que define a estos bienes es *el uso público al que se destinan*". (Bastardillas en el original). *Watchtower Bible v. Mun. Dorado I*, 192 DPR 73, 85 y 89 (2014). En el caso de la Reserva protegida, la NOAA y el Gobierno de Puerto Rico la destinaron al uso educativo e investigativo. Por idénticas razones, la invocación al Tratado de

---

[124] Idéntica definición se acoge en el Art. 704 del Código Civil, 31 LPRA sec. 7822.

París o la naturaleza privativa de antaño es impertinente.[125] Aun cuando la Reserva no estuviera protegida de la figura de usucapión, la prueba del expediente demuestra que las construcciones en la zona reivindicada comenzaron en el 2015, con un desarrollo acelerado en 2022. Así, lo determinó el TPI, sin que los apelantes lograran controvertir las aseveraciones fácticas:

.    .    .    .    .    .    .    .

177. Según la fotografía núm. 153 tomada el 8 de agosto de 1971 en Salinas Puerto Rico, provistas por la Autoridad de Carreteras y Transportación de Puerto Rico, no se observan estructuras en el área en controversia.

178. Comparando la fotografía núm. 153 tomada el 8 de agosto de 1971 en Salinas Puerto Rico, con la fotografía núm. 101 tomada el 18 de febrero de 1977, la fotografía refleja un ensanchamiento del Camino del Indio en el área en controversia, al igual que deforestación a lo largo del Camino del Indio en la dirección Sur y Sureste.

179. En la fotografía núm. 18 del 22 de enero de 1985, provista por la Autoridad de Carreteras y Transportación de Puerto Rico, comienza a observarse la proliferación de estructuras a lo largo del Camino del Indio al igual que estructuras sobre el agua. No obstante, no se logra distinguir con claridad la existencia de estructuras en el área en controversia.

180. En la fotografía núm. 110 del 22 de octubre de 1997, provista por la Autoridad de Carreteras y Transportación de Puerto Rico, se observa un aumento significativo de estructuras a lo largo del Camino del Indio, al igual que muelles o tablados en la costa. Sin embargo, no se pueden distinguir estructuras en el área de controversia.

181. En la foto aérea tomada por el Cuerpo de Ingenieros en el 2010, se puede distinguir en el área en controversia la existencia de varias verjas que segregan los solares, en especial los lotes número 36, 37 y 38, según enumerados por el plano *Condominios Los Indios Barrio Las Mareas, Salinas P.R.* Aun no se ven estructuras inmuebles o muebles en el área en controversia con excepción de las mencionadas verjas.

182. Desde la deforestación del área en controversia en o después del 1972 hubo muy poca actividad de desarrollo o construcción del área del Camino del Indio hasta el 2015.

183. En la imagen satelital con fecha del 14 de julio de 2015, se observa en los lotes identificados con los números 38, 39 y 40 según el plano *Condominios Los Indios Barrio Las Mareas, Salinas P.R.,* la remoción de material vegetativo que crea dos veredas o caminos desde los lotes hacia la costa.

184. En la imagen satelital con fecha del 3 de julio de 2016, se observa en los lotes identificados con los números 38, 39 y 40 según el plano *Condominios Los Indios Barrio Las Mareas, Salinas*

---

[125] TA2025AP00605 error 10. La cesión de Puerto Rico en 1898 incluyó la renuncia a los bienes de dominio público bajo la corona española a favor de Estados Unidos. Previamente, la Ley de Puertos de 1886 había decretado como bien público la zona marítimo terrestre.

*P.R.,* el comienzo del desarrollo y construcción de los mencionados lotes.

185. En los lotes mencionados en el renglón anterior, se observa en la imagen satelital del 20 de enero de 2017, dos muelles, 5 verjas y una estructura en el lote 39 según identificado en plano *Condominios Los Indios Barrio Las Mareas, Salinas P.R.*

186. En la imagen satelital del 1 de enero de 2018, se observa un desarrollo masivo del área en controversia lo cual incluye la deforestación; tala de mangles y relleno del área.

187. En la imagen satelital del 3 de agosto de 2020, se observa un desarrollo más amplio del área en controversia lo cual incluye la deforestación; tala de mangles; relleno del área; construcción de muelles e instalación o construcción de estructuras muebles e inmuebles.

188. En la foto aérea tomada por el agrimensor Gerardo J. Ramos Velázquez en el 2022, como parte de los trabajos del agrimensor Vega Santos, se observa el área en controversia con un desarrollo masivo el cual incluye la construcción de aproximadamente 8 muelles, varias rampas para botes y más de una decena de estructuras muebles e inmuebles.

En la causa del epígrafe, la defensa de usucapión no procede. De entrada, los apelantes adolecen de justo título sobre el predio que poseen, pues sus títulos corresponden a la finca **3752**, no a la ubicación actual, cuya prescripción adquisitiva invocan. Conforme lo concluido, los predios poseídos no corresponden a la ubicación geográfica de la finca **La Cuarta**, ya que ésta colinda en tres de sus partes con la finca **267**, de la cual se segregó. Empero, los lotes ocupados están sitos en la finca **14269**, antes **5791** y **383**, los cuales no colindan en ninguno de sus lados con la finca **Monte del Estado**. Sobre dicha posesión, es meritorio aclarar que la prescripción sería individual, ya que en los terrenos ocupados no existe una comunidad como en **La Cuarta**.

Si bien puede reconocerse que los apelantes han tenido una posesión civil, bajo la creencia de que son dueños de los terrenos detentados y cuya presencia, en parte, fue tolerada de tiempo en tiempo por su verdadero dueño, lo cierto es que dicha posesión no ha sido continua ni se ha cumplido con el término extraordinario de 30 años. No es hasta el 2015 en adelante que se documenta la construcción de estructuras muebles e inmuebles. A lo anterior sumamos los actos reivindicativos que el DRNA observó, por ejemplo, la construcción del portón. Finalmente, lo crucial, según hemos señalado, es que la finca **14269** está afecta al dominio

público. No olvidemos que, desde la adquisición de la finca **5791 o Lugo Viña** en 1982, para fines de investigación y educación, sustancialmente financiada con fondos federales de la NOAA y al palio del estatuto federal, *Ley de Manejo de la Zona Costanera de 1972, supra,* la franja predial en controversia se tornó imprescriptible e inapropiable. Es forzoso concluir que el error imputado, al no reconocerse la figura de usucapión, no fue cometido.

### VIII. *Sentencia declaratoria*

Como se sabe, la Regla 59 de Procedimiento Civil, 32 LPRA Ap. V, R. 59, gobierna lo concerniente a la solicitud de sentencia declaratoria. Este pronunciamiento se dicta cuando existe una controversia sustancial entre partes legitimadas con intereses legales adversos, con el propósito de disipar la incertidumbre jurídica. *Mun. Fajardo v. Srio. Justicia et al.,* 187 DPR 245, 254 (2012); *Mun. Fajardo v. Srio. Justicia et al., supra,* págs. 254-255; *Romero Barceló v. E.L.A.,* 169 DPR 460, 475 (2006). Nuestro alto foro ha delimitado que la sentencia declaratoria "es un mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra quien la solicita". *Alcalde de Guayama v. ELA,* 192 DPR 329, 333 (2015).

Luego de un examen independiente del expediente, hemos arribado a una idéntica conclusión, según adoptada en la *Sentencia* apelada. La ubicación de los apelantes no corresponde a **La Cuarta**, cuya titularidad ostentan. La finca **3752**, **La Cuarta**, surge inequívocamente al segregarse de la finca **267**, **Monte del Estado**, colindando con su matriz al Norte, Este y Oeste, por lo que no colinda con la finca **383** ni su remanente. De ésta última se segregó la finca **5791**, al presente la finca **14269**, al agruparse con la finca **13320**. Como surge de su descripción registral, la cabida aproximada de **La Cuarta** es de cinco cuerdas y media. Sin embargo, la evidencia muestra que la franja de manglar en la zona marítimo terrestre que ocupan los apelantes es en exceso al área descrita en sus títulos e

invaden predios públicos. En específico: 51,463.9371 metros cuadrados o 13.0938 cuerdas.

Decididamente, la sentencia declaratoria resultó ser el mecanismo idóneo para disipar la incertidumbre sobre la cabida y colindancias de la Reserva y reivindicar el predio ocupado, por ser única y exclusivamente propiedad del Estado. Por consiguiente, a base de los hechos probados y el derecho aplicable, colegimos que los decretos declaratorios impugnados son correctos. Por lo tanto, refrendamos las determinaciones consignadas en el dictamen y las órdenes allí dispuestas.

## IX. *Parte dispositiva*

Por los fundamentos expuestos, desestimamos el recurso apelativo TA2025AP00594 por falta de perfeccionamiento y duplicidad. A su vez, confirmamos la *Sentencia* apelada en todos sus extremos.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones